104 So.2d 253 (1958)
Murphy G. ROHNER, Plaintiff-Appellee,
v.
AUSTRAL OIL EXPLORATION COMPANY, Inc., et al., Defendant-Appellant.
No. 4655.
Court of Appeal of Louisiana, First Circuit.
June 30, 1958.
Jones, Walker, Waechter, Poitevent & Denegre, John V. Baus, New Orleans, for appellant.
Ponder & Ponder, Amite, for appellees.
ELLIS, Judge.
Plaintiff is seeking damages which he alleged were caused or done to his crops and land by the defendant oil company when it drilled or explored for oil on *254 his property in Tangipahoa Parish, Louisiana. No service of citation and petition was ever made on the defendant McGhee, however the oil company filed an answer admitting the existence of an oil and gas lease under which it drilled a well upon the plaintiff's property, and in this answer also denied that its operation had caused any damage to plaintiff's land or growing crops.
Plaintiff in his petition itemized damages as follows:

The damage to corn crop $800.00
Damage to Watermelon crop 400.00
Destruction of productivity of four acres of
 ground 1000.00
Damage to fence 120.00
Annoyance, mental anguish, etc. 500.00
 ________
 $2320.00

After trial on the merits the lower court rendered judgment in favor of the plaintiff, awarding $500 for damage to his corn crop, $200 for damage to his watermelon crop, and $300 damage to plaintiff's land or a total of $1,000. No award was made for damage and repair to plaintiff's fence nor for the item of annoyance, mental anguish, etc. From this judgment the defendant, Austral Oil Exploration Company, Inc., appealed to this Court. The plaintiff has answered the appeal and asked that the award granted by the lower court be increased to the full amount alleged and prayed for in its petition.
The lease between the plaintiff and defendant oil company provided:
"The lessee shall be responsible for all damages to timber and growing crops of lessor caused by the lessee's operations."
The various witnesses that testified on behalf of the plaintiff estimated the number of acres of corn destroyed by the defendant from four to seven and fixed the yield per acre from 50 to 65 bushels, and the price at the time from $1.50 to $2 per bushel. The defendant offered one witness, its supervisor in the drilling department during the time the well was being drilled on plaintiff's property. This witness stated that the entire amount of ground utilized by the defendant oil company in its drilling operations was almost exactly three acres, and that of this amount approximately one-half or one-third was in corn, which was destroyed. He also testified that in his opinion the yield would have been 25 to 30 bushels per acre.
The witnesses who testified on behalf of plaintiff were all farmers of Tangipahoa Parish and apparently eminently qualified. It was also shown by the plaintiff and his witnesses that the damage was not only done by the construction of the rig but, for example, the derrick had been laid out in the corn field and put together there, and further that trucks coming in would not stay on the runway but would run off and into the corn field and would turn in the corn field. Considering the entire testimony in the record we find no manifest error in the award of $500 made by the lower court in favor of the plaintiff in the loss of his corn crop.
Plaintiff testified that he had two acres of watermelons on the north side of the rig from which he did not gather any watermelons nor sell any due to the fact that "They were destroyed so bad. The trucks would go in there and bust them up and pack all the best stuff out and there was nothing left." It was shown by plaintiff and his witnesses his watermelons would have averaged from 800 to 1,200 per acre with a minimum average return of 25¢ per melon. Also testimony showed that the melons were destroyed by the defendant company truck running in the patch and by defendant's employees eating and hauling the melons away. There is testimony that one whole truck load was hauled out of the patch; however, the truck was not identified as belonging to the defendant, but it is not likely that it was any third party stranger to the drilling operations. The defendant's employees repeatedly told witnesses who testified on behalf *255 of the plaintiff that the company was going to pay for the damage to the watermelons and that is why they were eating them and serving them to their friends who would visit the well. While it does seem impossible or improbable that sixteen employees of the defendant company could have eaten that many watermelons the testimony without a doubt is to the effect that the entire two acres was practically destroyed to such an extent that plaintiff realized not one penny or gathered one melon for himself from the patch. The testimony shows they were eaten and destroyed by the trucks which turned in the watermelon patch and also by the employees of the defendant when they left the job taking some of the watermelons with them with the full expectation of the oil company paying for their damage to the crops. Plaintiff's witnesses also testified that watermelons were sometimes sold as is per acre, that is, in the field, and they brought approximately $200 per acre. Considering all of the testimony we believe that the award of the lower court in favor of the plaintiff for the loss of his watermelon crop should be increased to the full amount prayed for of $400.
Plaintiff next claims damages of $250 per acre to four acres of his land upon which the actual drilling rig and turnaround was placed and the pits dug which were necessary in order to drill the well. Plaintiff contends that the clay which was used in the drilling and which was pushed up in digging the pits and the actual material necessary in drilling the well had ruined four acres for farming and that it would cost $250 per acre to place this land back in its former production.
Counsel for defendant oil company in his brief has referred the Court to an article in the Tulane Law Review, Volume 26, Page 522 dealing with such a contention. He has ably and correctly summarized the information contained in this authority and we take liberty of quoting same from his brief, which is as follows:
"The laws governing the rights between a lessor and lessee in an oil and gas lease have been very capably summarized in 26 Tul.L.Rev. 522. From this article, the surface rights between a mineral lessee and lessor can be summarized as follows:
"1. Generally, the surface rights of the parties to a mineral lease are expressly provided for by the terms of the lease.
"2. In all mineral leases, it is expressed or implied that the mineral lessee may use an area of the surface which is reasonably necessary to drill for oil and gas, dig pits and drainage ditches, erect storage tanks, construct pipelines and telephone lines, and build roads for ingress and egress.
"3. A mineral lessee, unless restricted by the terms of the lease, may use any part of the surface necessary to conduct mineral operations, notwithstanding the lessor's prior appropriation of the use of the land.
"4. Unless provided for in the lease, the lessee is not responsible for damages which are inflicted without negligence upon the lessor's property in the course of necessary drilling operations. Moreover when the damaging of the lessor's property by the mineral lessee is not negligent per se, the lessor must prove that the injury was caused by unreasonable or negligent operations of the lease.
5. Due to the fact that the mineral lessee is not liable in damages to the lessor's property which results from reasonable and necessary use, the lessor should expressly provide for compensation for damages to his buildings, crops, trees, livestock and fences.
While plaintiff established that this land which totaled less than three acres according to actual measurement had been rendered practically useless for growing of *256 crops he has failed to show that such a result was due to any negligent act performed by the defendant company upon his property in the course of the necessary drilling operations. In other words, the condition or infertility of the land actually used for the pits and clay and drilling operation was due to the ordinary, customary, and necessary acts which must be done by drilling company in order to put down a well. There is no negligence shown on the part of the defendant oil company which was responsible for the infertile condition of this little piece of land. The record shows that the defendant oil company employed Kent Piling Company to bring its bulldozer to the scene of the drilling and level the land which the plaintiff claims is rendered useless. Plaintiff admitted that as far as the defendant oil company could they had placed this land back in a satisfactory condition.
Under the law and facts we do not believe that plaintiff is entitled to the award given by the lower court for damage to the land actually used for the pit and drilling operation. The damage was not the result of any negligent act committed by the defendant oil company in drilling the well.
It is shown that the defendant oil company cut plaintiff's fence in about the middle of the tract and placed a gap as a point of entry for its board runway to the drilling site. Plaintiff contends as the result of this act and the failure of the oil company to properly brace the post on each side of the gap that his entire fence became loose and absolutely insufficient as a protection to his crop from cattle and therefore it was necessary that he rebuild and tighten a portion of his fence. He testified that he employed two men for six days at $5 per day and bought wire and posts all of which totaled $120. The lower court did not allow any damages to the plaintiff on this item. While plaintiff did not produce the two men whom he employed to repair and replace his fence nor bills showing the amount of posts and wire which he bought and for this reason probably the judge denied his claim, however, we believe that his testimony is sufficiently corroborated by that of Layton Varnado and Elvin Hughes so as to entitle him to an award in the amount claimed by him.
We find Mr. Varnado testified in respect to this claim of the plaintiff as follows:
"Q. Mr. Varnado, there is another item of damage of reconstruction or rebuilding of fence. What effect does the cutting of a fence have where the cut is in the middle? A. It usually slackens it the length of the fence or either to where the first brace or post in the fence line.
"Q. In repairing a fence what is necessary to be done in reconstructing a fence of that nature? A. You have to tear the old fence down to however far it slackened it and build it back. Have to take all your wires aloose and attach them back and restretch them.
"Q. Are you familiar with the cost of rebuilding and restoring fences? A. Well, it's a pretty expensive proposition right now. I'm trying to build some myself and it's costing me at the least I can get is figure about $6.00 a day for labor and seems like they get along mighty slow.
"Q. It's in evidence here by Mr. Rohner that he employed two men for six days in addition to his own work to rebuild that section of fence. Would you say that would be a reasonable time to rebuild it?
"Mr. Baus: I object to it as being an improper question.
"The Court: Will sustain the objection.
"Q. Your testimony is that you pay a man how much? A. It cost me $6.00 per day.
"Q. How much for posts? A. Well posts cost about 60¢ per post for just an averaged post.
"Q. And your wire, is that extra, too? A. Yes."
*257 Witness tendered.
Cross Examination by Mr. Baus:
"Q. Mr. Varnado, you yourself didn't see any damage to Mr. Rohner's fence did you? A. Sure, the fence was cut down and laid wide open there where they went in.
"Q. Didn't you also know that that was replaced by a new fence after the operation was finished? A. No, I didn't see it replaced."
"Mr. Hughes testified as follows:
"Q. Mr. Hughes, coming back, did you notice the repair to the fence, what they did to the fence in order to gain entrance to this operation? A. You mean what kind of opening did they make?
"Q. Yes, did they have to cut the fence? A. Yes, they cut it. They made what we call a poor man gap therethat's where you just cut the fence and stick up a pole and just pull the barbed wire back.
"Q. Was that at the corner of his field or in the middle of a span of fencing? A. His fence must be a half a mile there. It was practically in the center. I think it's a little bit further to the east than it is to the west.
"Q. What damage would a man sustain by having a fence close to the middle of a span? A. If you don't put up some anchor posts there and anchor it well if you cut a fence it usually will just drawnaturally they got tension on that wire when you got wire stretched and it will draw back to the corner or where they may be another anchor post and they didn't put no anchor posts there.
"Q. Did you have occasion to see Mr. Rohner and I believe he testified he had two men assisting him in the repairs and reconstruction of that fence? A. I passed one day and asked what he was doing and I was kidding him about some politician and I said are you going to fix that fence or going to let that politician when he widens the road and he said no, I am fixing what the oil company tore up."
And it is true that an objection was made to what Mr. Rohner told him which was sustained by the lower court, however, his testimony and that of Mr. Varnado is sufficient to corroborate the plaintiff as to the condition of the fence and the fact that he did repair the fence after the oil company had left. We see no reason to doubt the plaintiff's word as to the cost of his labor for it is apparently most reasonable and would amount alone to $60 without counting the plaintiff's time as anything. We believe that the plaintiff was truthful in his statement that the labor cost him $60 in addition to his own labor and that of the cost of the wire and posts or the total was $120.
We also find in the record where counsel for the plaintiff stated
"I have these other witnesses, if the Court please. One is Mr. Emile Casanova back there.
"The Court: Do you want to make that stipulation?
"Mr. Ponder: Their testimony will be practically the same except two of them are watermelon raisers and they are here as specialists in that subject.
"Mr. Baus: I am afraid I wouldn't be very capable of cross examining them anyway so I will enter into stipulation subject to the objection I noted that the testimony is purely repetitious and it is purely cumulative.
"Mr. Ponder: Let me get them all in here so we can get their names and addresses. If the court please, we offer
"The Court: Just those who haven't testified.

*258 "Mr. Ponder: We offer the additional witnesses Charles M. Carrier, Emile Casanova, Leon Husser, Austin Casanova, who live in that vicinity as witnesses who will testify substantially in accord with the previous two witnesses.
"Mr. Baus: We object in that it's cumulative and repetitious but we will agree that if they testified their testimony would be substantially similar to the testimony of Mr. Varnado and Mr. Hughes.
"The Court: Will overrule the objection.
"Mr. Ponder: With one exception. Let me swear him and him on that question of watermelons."
Under this stipulation these witnesses would have testified the same as Varnado and Hughes and we believe that taking all the testimony that the plaintiff has proven his damages of $120 for repairing and rebuilding the fence.
We are not unaware of the previous law which we quoted from the plaintiff's brief that for the defendant company to be responsible in damages where the contract of lease is not specific or otherwise stipulated, that the act causing the damage must be due to a negligent act on the part of the defendant oil company in carrying out its drilling operations under the terms of the lease. We believe that it is clearly shown that the defendant oil company cut the plaintiff's fence in the middle and did not brace the posts on either side of the gap, thus causing the fence to become loose back to other corner, or as far as it might be distant to the first brace, and that this being an old fence it was necessary in order to repair the fence that plaintiff take it all down and rebuild it by tightening the old wire and replacing any that was rendered useless by new wire.
We find the lower court was correct in denying any damage to the plaintiff for annoyance, mental anguish, loss of sleep and rest by reason of the drilling operation.
For the above and foregoing reasons the judgment of the lower court is amended by allowing $200 additional for damage to plaintiff's watermelon crop and $120 for damages to plaintiff's fence and by disallowing damage to plaintiff in the sum of $300 to his land, all of which would increase the award of the lower court by the sum of $20 or a total award of $1,020. As amended the judgment of the district court is hereby affirmed at the cost of the defendant.