815 So.2d 876 (2001)
Herbert James ISADORE
v.
PROBE OFFSHORE, L.L.C., et al.
No. 01-777.
Court of Appeal of Louisiana, Third Circuit.
December 19, 2001.
Writ Denied April 12, 2002.
*877 James P. Ryan, Morrow & Morrow, Opelousas, LA, Counsel for Plaintiff/Appellant: Herbert James Isadore.
Michael Gerard Lemoine, Breaud & Lemoine, Lafayette, LA, Counsel for Defendant/Appellee: Probe Offshore, L.L.C.
Court composed of ULYSSES GENE THIBODEAUX, BILLIE COLOMBARO WOODARD, and GLENN B. GREMILLION, Judges.
WOODARD, Judge.
Mr. Herbert Isadore filed suit against Probe Offshore, L.L.C. (Probe) for personal injuries, received in an explosion at an oil field plant site in Louisiana, while welding. After discovery and shortly before trial, Probe filed a motion for summary judgment, seeking to dismiss his claims, based on the Two Contract Statutory Employer Defense. The trial court ruled in Probe's favor. Mr. Isadore appeals, contending that there were disputed issues of fact that precluded summary judgment. We affirm.

* * * * *
Mr. Isadore, a field welder, sustained injuries from an explosion that occurred on October 18, 1999, at an oil and gas storage facility in the Lake Rosemound Field near St. Francisville, Louisiana.
*878 This case's history is germane to the legal issues, which we must resolve.
On July 12, 1984, the plant site landowner, Mr. Lloyd Lindsey, Sr., executed an Oil, Gas, and Mineral Lease to Texaco. Later, Texaco built a collection plant site on that property. The plant site included various pressure vessels, separators, piping, and a tank battery, consisting of two large metal oil storage tanks and a small fiberglass water tank, which a small earthen containment levee surrounded.
Following Texaco's petition in 1988, the Louisiana Office of Conservation established two drilling and production units at the Lake Rosemound Field, Sand Units A and B. Initially, the property, which this lease described and covered, contained both Sand Units A and B. However, through a series of Partial Releases, from July 1989 through October 1993, that portion of the Lindsey property, which was described in the original July 12, 1984 Mineral Lease, located outside the boundaries of Sand Unit A, was released. When Mr. Isadore was injured, the plant site was located entirely within Sand Unit A on the land described in the lease as of the last Partial Release of October 19, 1993. The plant site serviced the wells located in the mineral lease.
Then, Texaco sold its interest in the Lake Rosemound Field to various interest owners, including Aegis Energy, Inc. (Aegis), which became the operator in the early 1990's. As such, on June 1, 1993, Aegis executed a contract, known as a Joint Operating Agreement (JOA), with the other mineral interest owners. The JOA required Aegis to take charge of all operations, conducted in the Field, on behalf of the other mineral interest owners, including exploration, drilling, collection of royalties, allocation of expenses, and plug and abandonment operations, etc. This 1993 JOA specifically includes, as an exhibit, the July 12, 1984 Mineral Lease on which the plant site is located.
In 1995, Aegis approached Probe's owner, Dr. B.R. Eubanks, to ask him if he would participate in Lindsey Well No. 3, which was being drilled on the Lindsey property, covered by the July 12, 1984 Mineral Lease (Sand Unit A). In July of 1995, Dr. Eubanks purchased a 57% working interest in that lease through three Partial Assignments to him from Aegis. In May of 1995, as part of these assignments, Dr. Eubanks executed a letter agreement for Aegis to act as the field's operator, based on a JOA, identical to the one, which Aegis had executed with the other working interest owners in 1993. Additionally, in late July of 1995, Dr. Eubanks executed a Partial Assignment, giving one percent of his 57% interest in the July 12, 1984 Mineral Lease, to Probe. Thus, Dr. Eubanks owned 99% of his 57% working interest in the July 12, 1984 Mineral Lease and Probe owned one percent of Dr. Eubanks' 57% working interest in the lease.
Because Dr. Eubanks owned a majority interest in the Lake Rosemound Field, as well as in the July 12, 1984 Mineral Lease, in the summer of 1995, all interest owners in the field decided to appoint his company, Probe, to be operator, replacing Aegis. Accordingly, Probe assumed Aegis' June 1993 and May 1995 JOA's contractual rights, duties, and obligations. These duties included collecting and paying royalties, billing the other interest owners for their proportionate share of expenses, hiring third parties to provide services on the lease, and executing the JOA amendments.
Beginning in July of 1998, field production ceased being economical. Accordingly, on August 30, 1999, Probe contracted with Southern Well Abandonment and Peddling (SWAP) to plug and abandon one of the wells and to dismantle the remaining *879 surface equipment at the plant site, up to the earthen containment levee surrounding the tank battery. It contracted to remove, only, the standard normal equipment used in collection and storage of oil and gas, specifically, a heater treater, separator, and associated piping. The site contained an amine plant, to strip carbon dioxide from the natural gas produced from the wells, which had already been removed from the surface in late 1998. Additionally, there was a plant to remove liquid hydrocarbons from natural gas. Propax, a separate company which owned this equipment, planned to be responsible for its removal.
On the explosion's date, October 18, 1999, Mr. Isadore was using a blowtorch to cut pipe outside the containment levee, which was connected to the tank battery. He ignited flammables within the pipe, which, ultimately, set afire the tank battery, causing a violent explosion. The explosion burned his body, primarily, his arms and left hand.
Mr. Isadore filed suit against Probe. As an affirmative defense, Probe asserted tort immunity under the Two Contract Theory in La.R.S. 23:1061. After completion of discovery and setting this matter for trial, Probe filed a summary judgment motion and the trial court granted it.
It found that Probe had satisfied both components of the Two Contract Defense, specifically, that Probe had entered into a contract with a third party for work to be performed, as well as with SWAP for partial fulfillment of this work. It ruled that Probe met the first contract requirement through, either, Probe's Partial Assignment of the July 12, 1984 Mineral Lease or the 1993 and 1995 JOA's, in which Probe assumed the contractual duties as Operator of the Field in 1995.
Mr. Isadore appeals the trial court's ruling. He maintains that the trial court erred in granting Probe: (1) the Two Contract Defense, when there was evidence that the only contract, which was applicable to the plant site where the accident occurred, was a September 19, 1985 surface lease not applicable to Probe; (2) immunity under the July 12, 1984 Mineral Lease and the undated JOA, when, neither contract contains any language obligating Probe to restore the plant site to its original condition; (3) immunity under the July 12, 1984 Mineral Lease and the undated JOA, when both of these contracts had expired before Probe contracted with Mr. Isadore's employer, SWAP, to do work at the plant site on August 30, 1999; (4) immunity under the undated JOA, despite the fact that Probe was not a signatory to this agreement and had never been assigned rights under it; and (5) immunity based on evidence that Probe was the lessee/operator of the plant site, when there was conflicting evidence that Probe was acting as this plant site's owner.

* * * * *

THE MOTION FOR SUMMARY JUDGMENT
Appellate courts review summary judgments, de novo, under the same criteria that governed the trial court's consideration of whether or not summary judgment was appropriate.[1] Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law.[2]
*880 La.Code Civ.P. art. 966 charges the moving party with the burden of proving that summary judgment is appropriate. That party's supporting documentation must be sufficient to establish that no genuine issue of material fact remains to be decided.[3] Once the mover makes a prima facie showing that there is no genuine issue as to a material fact and that summary judgment should be granted, the burden shifts to the nonmover.[4] Furthermore, La.Code Civ.P. art. 967 provides, in pertinent part:
When a motion for summary judgment is made and supported as provided above, an adverse party may not rest on the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided above, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be rendered against him.
In summary, the threshold question in reviewing a trial court's grant of summary judgment is whether a genuine issue of material fact remains.[5] After which, we must determine whether reasonable minds could conclude, based on the facts presented, that the mover is entitled to judgment.[6] Thus, summary judgment is apropos when all relevant facts are brought before the court, the relevant facts are undisputed, and the sole remaining issue relates to the legal conclusion to be drawn from the facts.[7]
Facts are material if they determine the outcome of the legal dispute.[8] We must determine the materiality of a particular fact based on relevant substantive law.[9]
The relevant substantive law, sub judice, is tort immunity under the Two Contract Defense, under La.R.S. 23:1032 and 23:1061(A)(2). The latter states that a statutory employer relationship "shall exist" as long as the services or work, which Mr. Isadore's employer, SWAP, provided is "contemplated by or included in a contract" between Probe and any person, other than SWAP.
We must consider this along with other laws on the same subject,[10] specifically, La.R.S. 23:1032. This statute allows Probe to enjoy tort immunity, upon showing that: (1) it entered into a contract with a third party; (2) under which work was to be performed; and (3) it had to enter into a subcontract for all, or part, of the work to be performed in order to fulfill its original contractual obligation.[11]
The trial court found that the restoration of the leased premises' surface at an oil and gas plant site, which Probe's contract with SWAP called for, had been "contemplated ... or included" in either one or two contracts: (1) A July 12, 1994 Mineral Lease in which Probe had acquired an interest in July of 1995, or (2) the JOAs under which Probe acquired Operator status, also, in July of 1995.
*881 We agree and adopt portions of the trial court's excellent opinion concerning these two contracts.
MINERAL LESSEE
On July 12, 1984, a mineral lease was executed by Lloyd L. Lindsey, Sr. and Texaco, Inc. Lindsey is the lessor, and Texaco, Inc. is the lessee. Subsequently, Texaco, Inc. assigned the lease to another Texaco entity who in turn assigned it to Aegis Energy, Inc. in February of 1994. Subsequently, there were three partial assignments of this mineral lease from Aegis Energy, Inc. to B.R. Eubanks in July of 1955 which gave Mr. Eubanks 57% working interest in the mineral lease. Aegis Energy, Inc. retained a part of the remaining interest. Subsequently, in July of 1995 B.R. Eubanks and Probe Offshore executed a partial assignment of oil, gas, and mineral leases in which Mr. Eubanks assigned to Probe Offshore 1% of his interest in this July 12, 1984, oil, gas and mineral lease. Only the July 12, 1984, lease is relevant since it is the one that covers the area on which the plant site involved herein was situated. After Lloyd Lindsey granted the July 12, 1984, oil, gas and mineral lease to Texaco, Texaco successfully petitioned the Louisiana Office of Conservation in 1988 to establish two drilling and production units at Lake Rosemound Field, designated as Sand Units A and B. By October 19, 1993, at the time Probe Offshore acquired its 1% interest in this July 12, 1984, oil, gas and mineral lease, this lease only covered the Lindsey property contained in Sand Unit
A. Testimony establishes that the plant site is located entirely within the confines of Sand Unit A and entirely within the land described and subject to the July 12, 1984, oil, gas and mineral lease as of the last partial release of October 19, 1993, and as of Probe Offshore's acquisition of a 1% interest in this mineral lease. The Louisiana Mineral Code specifically states that an assignee or sublessee of a mineral lease becomes directly responsible to the original mineral lessor for performance of the original mineral lessee's obligations. This is set forth in Louisiana Mineral Code, Louisiana Revised Statute 31:127-132. According to the Louisiana Mineral Code, an original mineral lessee may assign or sublease his interest in the mineral lease and when this takes place, Section 128 of the code provides that the sublessee, as is Probe Offshore here, becomes responsible directly to the original lessor for performance of the lessee's obligations. Thus, by Probe Offshore's execution of the partial assignment with B.R. Eubanks in July of 1995, Probe Offshore acquired the contractual status of a mineral sublessee which directly tied Probe Offshore to the contractual obligations of the original mineral lessee under the original contract, the July 12, 1984, mineral lease.
Plaintiff herein, Isadore, argues that even if Probe Offshore has certain contractual obligations under the original July 12, 1984, mineral lease in light of its contractual status as a sublessee pursuant to the July 1995 partial assignment, there was no language in the original mineral lease requiring any mineral lessee (or sublessee) to restore the surface upon completion of operations. Isadore asserts that since the lease did not require the restoration of the surface upon completion of operations, that Probe Offshore was not obligated under contract to the original lessors and therefore the two-contract provision does not apply. The position of Probe Offshore is that though the original *882 lease did not require the restoration of the surface upon completion of operations, there is an implied covenant read into every such mineral lease and thus is made a part thereof as if written explicitly.
Louisiana Revised Statute 23:1061(A)(2) provides that the two-contract defense, requires only that the services provided by Mr. lsadore's immediate employer, SWAP, be contemplated by the original July 12, 1984, mineral lease. This is the covenant of course to restore the surface of the premises. Section 122 of the houisiana (sic) Mineral Code requires Probe Offshore as a mineral sublessee to perform the contract in good faith as a responsibly prudent operator. The comments under Section 122 specifically state that the obligation of the lessee to restore the surface of the leased premises on completions of operations may be viewed as a part of this general standard, and it is established that the mineral lessee must restore the surface even though the lease contract is silent. The Louisiana Supreme Court and the Third Circuit Court of Appeals of Louisiana have recognized the contractual duty of a mineral lessee to restore the surface upon completion of operations. See: Caskey v. Kelly Oil Company, 737 So.2d 1257 (La.1999) and Trinidad Petroleum Corporation v. Pioneer Natural Gas Company, 416 So.2d 290 (3 Cir., 1982). The Trinidad court stated that the implied obligation of a mineral lessee to restore the surface when operations are completed is read into every mineral lease. The Louisiana Supreme Court in Frey v. Amoco Production Company, 603 So.2d 166, (La.1992) specifically stated that in Louisiana a mineral lease is interpreted so as to give effect to the covenants implied in every lease.
Thus, the Louisiana courts have held that every mineral lease has an implied obligation under the mineral code to restore the surface of the premises upon completion of the operations. Therefore the mineral lease of which Probe Offshore is now a sublessee contains the contract between the mineral lessors and the sublessee, Probe Offshore, requiring Probe Offshore to restore the surface of the premises upon completion of operations. It is undisputed that this was what Probe contracted with SWAP to do at the time that the plaintiff was injured.
Plaintiff herein asserts that since there is a liberal construction of this Workman's Compensation statute in favor of tort actions that this court cannot put the implied mineral code obligation into the mineral lease. However, whether the court has a liberal or conservative interpretation of this matter, it is the law of contracts that there are implied conditions to the lease as required under the mineral code in this case. Therefore it is not a question of liberal or conservative interpretation but of contract interpretations under our law. Plaintiff asserts that this obligation on the lessee to restore the location can only be found by the court reading the statutory obligations into the contract. Plaintiff asserts that they are statutory obligations and not contractual obligations. However, the courts of Louisiana as well as the mineral code state that they are obligations which are implied in every mineral lease. Therefore they are part of the contract as statutory law.
This Court finds that through the mineral code Probe Offshore had a contractual obligation under the assignment of the mineral lease to the lessor to restore the plant site where this accident occurred. This is one of the two *883 contracts. The second contract is between Probe Offshore and SWAP for the employees of SWAP to perform this contractual obligation. Therefore the statutory employer relationship exists here and therefore Probe Offshore as the statutory employer is entitled to tort immunity.
JOINT OPERATING AGREEMENT
Probe Offshore asserts that it also had a separate contractual obligation to the other mineral lessees, i.e., the nonoperating working interest owners, to restore the surface of the leased premises pursuant to Probe Offshore's contractual obligations as the designated operator under the Joint Operating Agreement (JOA) which it assumed in July of 1995. Aegis was the prior designated operator, and had entered into a JOA with the other working interest owners setting forth its duties and responsibilities with respect to oil and gas production activities in the Lake Rosemound Field. When Dr. Eubanks acquired interest in the mineral leases from Aegis in May of 1995, he became a signatory to this Joint Operating Agreement while Aegis was still the designated operator. Thereafter, in July of 1995, Aegis resigned as operator and passed this responsibility on to Probe Offshore, including the contractual obligations contained in the written JOA. Page 4 of the May 23, 1995, letter agreement attached to the JOA specifically states that the validity of the JOA, including matters of performance and the duties of the operator shall be governed and determined by the applicable laws of the State of Louisiana. The applicable laws of the State of Louisiana require the operator and mineral lessees to restore the surface of the leased premises upon completion of operations. Louisiana Revised Statute 30:81, et. seq. (Louisiana Oil Field Site Restoration Law) and Louisiana Revised Statute 31:122 (Louisiana Mineral Code).
Aegis Energy as operator had executed a contract known as a JOA with the other interest owners effective June 1, 1993. This document attached as Exhibit 13 contains as Exhibit A the list of mineral leases effected by the 1993 JOA, which specifically includes the July 12, 1984, oil, gas and mineral lease discussed hereinabove on which the plant site was located. In 1995, Aegis Energy, Inc. approached B.R. Eubanks and Probe Offshore with the prospect of participating in a well being drilled on the property covered by the July 12, 1984, mineral lease, the Lindsey Well No. 3. Lindsey Well No. 3 was contained in Sand Unit A as is proved by Exhibit 14 as well as entirely within the land covered by the July 12, 1984, mineral lease as of the last partial release in October of 1993. When B.R. Eubanks, manager of Probe Offshore, expressed an interest in acquiring a 15% working interest in the 1984 mineral lease which would cover the drilling of the Lindsey Well No. 3, he executed an agreement with Aegis Energy dated May 23, 1995. This agreement demonstrates that various exhibits were attached and made part of the agreement including an identical JOA as Aegis had executed with the prior working interest owners in 1993. The May 23, 1995, agreement states that should B.R. Eubanks choose to purchase a working interest in the lease covering the Lindsey Well No. 3 (July 12, 1984 mineral lease), which he did in July of 1995, then as stated all operations conducted subsequent to the effective date of this agreement shall be conducted under the terms of and subject to that certain Joint Operating Agreement which is attached hereto as Exhibit B. *884 The evidence establishes that the Lindsey Well No. 3 which was the subject of the May 23, 1995, agreement and attached JOA, was located entirely within the boundaries of the July 12, 1984, mineral lease. Evidence shows a plat of the well on the Lindsey property which is totally within the confines of Sand Unit A. Additionally th [sic] evidence shows the location of Lindsey Well No. 3 to be within the boundaries of the July 12, 1984, mineral lease and close to the area of the plant site in question. Additionally the Lindsey Well No. 3 was actually serviced by the plant site in question. According to the affidavit of B.R. Eubanks as manager of Probe Offshore, Probe Offshore in fact was selected as the successor operator and assumed the contractual rights, duties and obligations of the former operator, Aegis Energy, pursuant to both the June 1993 and the May 1995 JOAs.
Since the May 23, 1995, letter agreement attached to the JOA specifically states that the validity of the JOA, including matters of performance and the duties of the operator shall be governed and determined by the applicable laws of the State of Louisiana, and since the applicable laws of the State of Louisiana require the operator and mineral lessees to restore the surface of the leased premises upon completion of operations, Louisiana Revised Statute 30:81 (Louisiana Oil Field Site Restoration Law) and Louisiana Revised Statute 31:122 (Louisiana Mineral Code), Probe Offshore as the operator was obligated under the JOA and the implied obligations imposed by Louisiana law to the contract. Accordingly, Probe Offshore had entered into a contract for restoration of the premises with the other mineral participants and had subsequently entered into a contract with SWAP to restore the surface of the premises and is therefore immune from tort liability under the Louisiana Workman's Compensation Act. Accordingly, the defendant Probe Offshore is dismissed as a statutory employer of plaintiff at the cost of plaintiff.
Mr. Isadore challenges the trial court's decision on various grounds.

THE SURFACE LEASE
Mr. Isadore presented evidence of a September 19, 1985 surface lease between Mr. Lloyd Lindsey, Sr., now deceased, and Texaco, as well as Mr. Lindsey's son's affidavit that the only contract, which his family had signed dealing with the accident's site, was the September 19, 1985 surface lease. The surface lease established the right to erect and operate the Plant and specifically designated the parties' responsibilities to restore the premises upon the agreement's termination. Mr. Isadore also presented Mr. David Knepper's testimony, Probe's representative, that such surface leases are common where extensive surface activities occur.
The trial court did not discuss the 1985 surface lease in its reasons for judgment. Mr. Isadore argues that it was clearly wrong for the trial court to ignore a contract, which makes specific reference to the Plant Site, in favor of two other contracts which make no reference to it. He urges that this surface lease created a genuine issue of material fact as to the obligations and rights concerning the Plant Site and that if the trier of fact were to conclude that the surface lease is the contract, that conclusion governs the rights and obligations as to the Plant Site and Probe's immunity claim fails.
It is undisputed that Probe was not a party to the 1985 surface lease. In fact, Probe did not know of the surface lease until Mr. Isadore raised the issue in opposition to Probe's summary judgment motion. Thus, we examine the contracts to *885 which it was a partythe July 12, 1984 Mineral Lease and the JOAsand determine that it had a contractual duty to restore the leased premises. Further, we note that the surface lease did not abrogate this contractual responsibility.
The surface lease was executed in September of 1985, over a year after the July 12, 1984 Mineral Lease's execution, but does not mention anything concerning the restoration obligation. Thus, it cannot be said to modify or change Probe's obligations under the Mineral Lease.
The surface lease was a separate document, between Mr. Lindsey, Sr., landowner/lessor, and Texaco. It was never assigned or subleased to Dr. Eubanks or to Probe. Additionally, there was no reference to it in any of the July 12, 1984 Mineral Lease's Partial Assignments to Dr. Eubanks or to Probe. Probe never became a surface sublessee, since there was no sublease agreement conferring any rights or obligations on it from this 1985 surface lease. Furthermore, neither, Probe nor Dr. Eubanks ever paid any rent under the surface lease upon their acquisition of the mineral interest in the land in question in 1995.
Mr. Isadore submitted an affidavit, regarding the surface lease, from the original landowner's son, Lloyd Lindsey Jr., who stated, "to the best of my knowledge this is the only agreement anyone in my family ever signed dealing with the land where the accident of October 18, 1999 occurred which is owned by my family." Mr. Isadore contends that this establishes a material fact dispute. However, this is not correct, since there is no dispute that Mr. Lindsey, Sr. executed the July 12, 1984 Mineral Lease. Moreover, Mr. Lindsey's statement, indicating that only the surface lease dealt with the land where the accident occurred, was clearly wrong.
Probe submitted affidavits from an oil and gas attorney and landman with considerable knowledge and experience in oil and gas matters, including those pertaining to the Lake Rosemound Field. After reviewing all relevant documents, he concluded that the plant site, in question, was located entirely within the land described in, and subject to, the July 12, 1984 Mineral Lease when Dr. Eubank and Probe acquired a partial interest in the Mineral Lease in July of 1995. Thus, the site is subject to the 1995 Mineral Lease's implied covenants. Accordingly, despite Mr. Lindsey, Jr.'s statement, there was no genuine issue of material fact that there were contracts, which affected the land where the plant site was situated, other than the surface lease to which Probe was a party.
Although the 1985 surface lease refers to constructing a plant, the July 12, 1984 Mineral Lease states, "use the land hereinafter described for the exploration for, and production of oil, gas, sulphur and other minerals, together with the use of the surface of the land for all purposes incident to the exploration for and production, ownership, possession, storage and transportation of said minerals." Either, the construction of the plant site or Probe's use of it for the collection, storage, and production of hydrocarbons in the Lake Rosemound Field, is consistent with the use of the surface under the July 12, 1984 Mineral Lease.
In Rohner v. Austral Oil Exploration Co,[12] this court said, "[i]n all mineral leases, it is expressed or implied that the mineral lessee may use an area of the surface which is reasonably necessary to *886 drill for oil and gas, dig pits and drainage ditches, erect storage tanks, construct pipelines and telephone lines and build roads for ingress and egress." Thus, it is of no moment that a surface lease, pertaining to the plant site, also, existed, since the construction or the use of the plant site was consistent with the rights and obligations of all mineral lessees, including Probe, under the July 12, 1984 Mineral Lease. Accordingly, there existed the concomitant obligation to restore the surface, as the Mineral Code required, upon cessation of operations.
Mr. Isadore argues that the 1985 surface lease was necessary, in addition to the July 12, 1984 Mineral Lease, because Texaco planned more equipment, than normal, at the plant site. This is based upon Mr. Knepper's testimony, when asked to speculate about why the surface lease was executed. Mr. Knepper testified that a normal plant site consists of a separator, heater/treater, and a tank battery. It is uncommon for a plant site to include an amine unit, as in the instant case. It is undisputed, however, that SWAP was contracted to remove the normal equipment, the separator, heater/treater, and the pipelines leading up to the tank battery, and not the amine plant, which another company or the liquid plant had removed.
We now consider these facts to determine whether summary judgment was appropriate.
In Smith v. Our Lady of the Lake Hosp., Inc.,[13] a material factual issue is genuine only "if reasonable persons could disagree. If reasonable persons could reach only one conclusion, there is no need for a trial on that issue." It is the applicable substantive law that determines materiality. Whether a particular fact, in dispute, is material can be determined, only, in context of the substantive law applicable to the case.[14]
In not discussing the surface lease, the trial court correctly concluded that no reasonable person could disagree that Probe was a party to, both, the July 12, 1984 Mineral Lease and the JOAs. Under the Mineral Code and this court's decision in Broussard v. Waterbury,[15] Probe had a contractual obligation, as a mineral sublessee and Operator, to restore the leased premises' surface and had contracted with Mr. Isadore's employer to partly fulfill this obligation.
Accordingly, we find that there is no error in the trial court's decision not to discuss the 1985 surface lease in its reasons for judgment and that the surface lease does not create a genuine issue of material fact, warranting reversal of the trial court's decision.

THE IMPLIED OBLIGATION TO RESTORE THE LEASED PREMISES
Mr. Isadore argues that, absent language in the July 12, 1984 Mineral Lease or in the JOAs, requiring the lessee to restore the surface upon the operation's completion, Probe's defense would fail, because it must prove that it entered into a contract to restore the location with a third-party and, then, sub-contracted this work. Mr. Isadore does not deny that a mineral lessee/operator has certain restoration obligations under Louisiana law. Instead, he maintains that these are statutory, *887 not contractual, obligations. He argues that they cannot, and should not, be read into contracts in order to grant immunity to a negligent tortfeasor, who has injured someone.
Mr. Isadore's argument is without merit.
La.Civ.Code art. 2054 provides the authority to find an implied incidental obligation in the lease and the JOAs' requirement that Probe must restore the leased premises:
When the parties made no provision for a particular situation, it must be assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose.
(Emphasis added).
Concerning the July 12, 1984 Mineral Lease, La.R.S. 23:1061(A)(2) requires, only, that the services, which SWAP provided, be "contemplated by" the original July 12, 1984 Mineral Lease. That service is restoration of the surface (plant site). Additionally, under La.R.S. 31:122 of the Mineral Code, Probe is required to perform the contract in good faith as a reasonably prudent operator. The comments under this section specifically state that "the obligation of the lessee to restore the surface of the leased premises on completion of operations may be viewed as a part of this general standard," and "[i]t is established that the mineral lessee must restore the surface even though the lease contract is silent."
Moreover, the supreme court and this court have recognized a mineral lessee's contractual duty to restore the surface upon completion of operations.[16] In Trinidad Petroleum Corp., we stated that a mineral lessee has an implied obligation to restore the surface when operations are completed. In Justice Dennis' concurring opinion in Butler v. Baber,[17] he said that La.R.S. 31:22, which requires a mineral servitude owner "to restore the surface to its original condition at the earliest reasonable time," is also applicable "between the landowner and the mineral lessee."
The July 12, 1984 Mineral Lease and the Mineral Code obligate the non-operating working interest owners, independently, to have the surface restored. (Non-operating working interest owners are mineral lessees or sublessees who are not obligated to perform operations under a JOA.) In the instant case, they hired Probe for that purpose, inter alia.
Probe's assumption of the JOAs' contractual duties, as Operator in the Field, obligated it, among other things, to restore the leased premises' surface on behalf of the non-operating working interest owners. For instance, Article VI(E) governed its responsibilities to plug and abandon wells no longer in production. Its contract with SWAP was a fulfillment of this obligation, since SWAP was, not only, to clean some of the plant site's surface equipment but, also, to plug and abandon a well. Article XIV(a) of the JOA states that "This operating agreement shall be subject to the conservation laws of the state in which the committed acreage is located, to the valid rules, regulations and orders of any duly constituted regulatory body of said state; and to all other applicable federal, state, and local laws, ordinances, rules, regulations, and orders." *888 La.R.S. 30:81 et seq., the Louisiana Oilfield Site Restoration Law, mandates that it is in the public interest and within the State of Louisiana's police power to ensure the proper and timely cleanup, closure, and restoration of oilfield sites. The Louisiana Mineral Code and the Oilfield Site Restoration Law imposes a direct obligation on mineral lessees to restore the leased premise's surface. Thus, undoubtedly, Probe had the contractual obligation to comply with such laws, not only, on its behalf but, also, on behalf of the non-operating working interest owners because of its responsibility as a prudent Operator under the JOA. Accordingly, when Probe became the contractual Operator of this field, it was contractually obligated to restore the site. This was an implied incidental obligation of the lease and the JOAs, under La.Civ. Code art.2054.
This assignment of error is without merit.

THE EXPIRATION OF THE LEASE AND THE JOA's
Mr. Paul Provenza, an expert in oil and gas law and a professional landman, maintained, in his affidavit, that the July 12, 1984 Mineral Lease expired in July of 1998; however, "while the lease may have expired subsequent to July of 1998, various obligations of the lessees did not, including the obligation to restore the surface which contained the plant site and to properly pay all royalty due."
Additionally, Mr. Isadore alleged that the JOA is a derivative of the July 12, 1984 Mineral Lease and would have expired in July of 1998. Thus, he argues that both contracts were no longer in effect when Probe contracted with SWAP to do work at the Plant Site on August 30, 1999.
Under the Mineral Code and its interpretative jurisprudence, a Mineral Lessee's implied obligation to restore the surface, when operations are completed, is read into every mineral lease. A lease's expiration triggers certain restoration duties for the mineral lessee and the field's operator under the mineral lease and JOAs. The lessor has ten years to enforce these obligations in court.
We find that the obligations under the lease and the JOAs still existed when Probe contracted with SWAP for site restoration work. This is true even though production had ceased under the July 12, 1984 Mineral Lease at the time that Mr. Isadore was injured.
This assignment is without merit.

PROBE NOT A SIGNATORY TO THE JOAS
Mr. Isadore argues that the trial court erred in finding that Probe had a contractual obligation to restore the leased premise's surface under the JOAs, because Probe was never a signatory to the agreements nor was there any evidence that these JOAs had ever been assigned to Probe. We disagree.
Significantly, Aegis was the prior designated Operator of the Field and had entered into a June 1993 JOA with other working interest owners, setting forth its duties and responsibilities concerning oil and gas production activities in the Field. When Dr. Eubanks acquired an interest in the Mineral Leases from Aegis in May of 1995, he became a signatory to an identical JOA, while Aegis was still the designated Operator. Thereafter, in July of 1995, since he was the majority interest owner of the leases in the field, Aegis resigned as Operator and passed this responsibility, including the contractual obligations in the June 1993 and May 1995 JOAs, onto his company, Probe.
The record establishes that Probe acquired contractual rights and obligations under the JOAs from Aegis, under Article V(B) of the 1993 and 1995 JOAs entitled, "Resignation or Removal of Operator and Selection of Successor," which outlines the process. Furthermore, on July 27, 1995, *889 Aegis wrote a formal letter to the "Lake Rosemound Working Interest Partners," resigning as Operator and appointing Probe as "the new Operator of the Field... [to] represent all of our interests in a professional and responsible manner." The letter states that a voting process would take place in order to select Probe as the new Operator and that "Aegis hereby casts its vote for Probe." On August 8, 1995, Dr. Eubanks, the majority interest owner in the leases, submitted his vote of approval for Probe.
By affidavit, he confirms that, as manager of Probe and the majority interest owner in the lease, working interest owners selected Probe as the successor Operator and that Probe assumed the former Operator, Aegis,' contractual rights, duties, and obligations in the June 1993 and May 1995 JOAs. Mr. Knepper testified that Probe, not only, assumed Aegis' position as Operator in late July 1995 but, also, Aegis' contractual responsibility under both JOAs. Moreover, Probe's actions, subsequent to taking Aegis' place as the Field's Operator in July of 1995, demonstrate that Probe assumed the contractual obligations of Operator under the prior JOAs.
Thus, there are no genuine issues of material fact in dispute that Probe assumed the contractual responsibility as operator of the field under the June 1993 and May 1995 JOAs.
This assignment is without merit.

PROBE, ACTING AS OWNER OF THE PLANT SITE?
Mr. Isadore argues that there was conflicting evidence concerning Probe's ownership of the equipment, which SWAP was removing at the plant site, instead of Probe and the mineral lessees and sublessees acting simply as lessees/operator.
Mr. Isadore raised this issue because Probe instituted a separate lawsuit against SWAP for the damage, which the explosion caused to the equipment at the plant site. However, ownership of the equipment is irrelevant, because Probe still had the duty to restore the leased premises surface as a mineral lessee under the Mineral Code and the JOAs' obligations. Even if Probe and the other mineral lessees and sublessees owned the equipment at the plant site, there would be no genuine issue of material fact that would warrant reversing the trial court's grant of summary judgment.
This assignment is without merit.

CONCLUSION
There is no error in the trial court's decision, granting summary judgment in Probe's favor, thus, dismissing Mr. Isadore's claims under the Two Contract Defense. Probe is his statutory employer and, therefore, is entitled to immunity from his tort suit. We cast him with costs.
AFFIRMED.
NOTES
[1] Schroeder v. Board of Sup'rs of La. State Univ., 591 So.2d 342 (La.1991); Soileau v. D & J Tire, Inc., 97-318 (La.App. 3 Cir. 10/8/97); 702 So.2d 818, writ denied, 97-2737 (La.1/16/98); 706 So.2d 979.
[2] La.Code Civ.P. art. 966(B).
[3] Townley v. City of Iowa, 97-493 (La.App. 3 Cir. 10/29/97); 702 So.2d 323.
[4] Id.
[5] Kumpe v. State, 97-386 (La.App. 3 Cir. 10/8/97); 701 So.2d 498, writ denied, 98-50 (La.3/13/98); 712 So.2d 882.
[6] Id.
[7] Id.
[8] Soileau, 702 So.2d 818.
[9] Id.
[10] La.Civ.Code art. 13.
[11] Peterson v. B.E. & K., Inc. of Alabama, 94-5 (La.App. 1 Cir. 3/3/95); 652 So.2d 617.
[12] 104 So.2d 253, 255 (La.App. 3 Cir.1958); see also Caskey v. Kelly Oil Co., 98-1193 (La.6/29/99); 737 So.2d 1257.
[13] 639 So.2d 730, 751 (La.1994). 93-2512, p. 27 (La.7/5/94), 639 So.2d 730, 751, quoting W. Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, 99 F.R.D. 465, 481 (1983).
[14] Duncan v. Balcor Prop. Mgmt., Inc., 615 So.2d 985 (La.App. 1 Cir.), writ denied, 617 So.2d 936 (La.1993).
[15] 346 So.2d 1342 (La.App. 3 Cir.), writ denied, 350 So.2d 674 (1977).
[16] Caskey, 737 So.2d 1257; Trinidad Petroleum Corp. v. Pioneer Natural Gas Co., 416 So.2d 290 (La.App. 3 Cir.), writ denied, 422 So.2d 154 (La.1982).
[17] 529 So.2d 374, 383 (La.1988).