826 So.2d 1143 (2002)
Ronald ANDERSON, Melinda Clemons, Chad Wunstell, Connie Wunstell, and Albert Ragas,
v.
TENNECO OIL COMPANY.
Clark Fontaine, Jr., Donald J. Anderson and Kerri Waltman Anderson,
v.
The State of Louisiana Natural Resources Department, Mineral Resources Office and Conservation Office.
Nos. 2001-CA-0295, 2001-CA-0296.
Court of Appeal of Louisiana, Fourth Circuit.
May 22, 2002.
Opinion on Grant of Rehearing June 19, 2002.
Writ Denied November 1, 2002.
*1147 Terry A. Bell, Carimi Law Firm, Metairie, LA, for Ronald Anderson, Melinda Rene Clemons, Chad Wunstell, Connie Wunstell and Albert Ragas.
Philip F. Cossich, Jr., Darren D. Sumich, Cossich, Martin, Sumich & Parsiola, L.L.C., Belle Chasse, LA, for Clark Fontaine, Jr., Donald J. Anderson and Kerri Waltman Anderson.
Richard P. Ieyoub, Attorney General, G.A. Manthey, Jr., Assistant Attorney General, Louisiana Department of Justice, Litigation Division, New Orleans, LA, and James C. Bates, Special Assistant Attorney General, Strain, Dennis, Mayhall & Bates, LLP, Baton Rouge, LA, for State of Louisiana Through the Department of Natural Resources.
(Court composed of Judge CHARLES R. JONES, Judge TERRI F. LOVE, and Judge MAX N. TOBIAS, JR.).
CHARLES R. JONES, Judge.
Appellant, the State of Louisiana, appeals the judgment of the district court in favor of the Appellees, Donald Anderson, Ronald Anderson, Clark Fontaine, Jr., Albert Ragas, Chad Wunstell, Connie Wunstell, Renee Clemons and Keri Anderson, for damages caused by the Appellees boat allision with remnant pilings in the Bastian Bay. Following a review of the record, we affirm the judgment of the district court.

FACTS AND PROCEDURAL HISTORY
On the night of August 19, 1995, the Appellees were aboard a twenty-one foot fiberglass water vessel traveling through Bastian Bay in Plaquemines Parish. The purpose of this voyage was to scout various waterway locations in anticipation of the opening of shrimp season the next day. Donald Anderson was piloting the vessel and Clark Fontaine, standing next to him, was manning a powerful spotlight, scanning the waters ahead. At night, shrimp come to the surface of the water. A slow moving water vessel will push a swell of water in front of its bow and cause the shrimp in front of the vessel to jump out of the water.
As the vessel traveled in the waters of Bastian Bay at approximately fifteen miles per hour, it struck an unlit and unmarked piling structure protruding slightly above the water. The hull of the vessel imbedded itself upon the obstruction and the vessel stopped suddenly. As a result, the occupants were thrown violently forward. The Appellees in this matter all sustained personal injuries and damages of varying degrees.
It was later determined that the vessel had struck a series of pilings tightly surrounding a well casing. These structures were part of an oil well drilled in 1964 by the Tenneco Oil Company (hereinafter "Tenneco") on State owned water bottoms under State Lease 4176, a lease agreement obtained from the State.
The well resulted in a dry hole and Tenneco plugged and abandoned the well to the State in 1964-65. The State approved *1148 Tenneco's abandonment procedures and the lease was terminated.
The Appellees filed suit against Tenneco. However, upon being presented with evidence by Tenneco indicating that it had abandoned the well to the State, the Appellees settled with Tenneco and, in turn, sued the State of Louisiana and its varying departments (hereinafter collectively the "State") for acts of negligence, strict liability, and fault under both state and general maritime law.
On November 18, 1999, the district court rendered judgment holding the State solely liable for the accident and rendering various damage awards to the Appellees. It is from this decision the State filed this appeal, assigning issues for our review.

OWNERSHIP AND GARDE OF PILINGS
The first issue we will discuss is who had the ownership and garde of the wood pilings, respectively. The State argues that the pilings are the separate immovable property of Tenneco because Tenneco constructed the pilings, and admitted ownership of the pilings. The State also argues that since they did not demand removal of the pilings, they were consenting to Tenneco remaining the owner of the pilings.
The Appellees argue that the testimony of the State's designated representative and witness, Brent Campbell, that the State owned and controlled the water bottom and the fact that the lease was given a state designation supports the contention that it was state property. The Appellees also contend that ownership of the well casings and pilings belonged to the State by operation of law because Tenneco no longer had permission to keep it's building on the State's land. Further, the Appellees argue that the State approved and accepted a Plug and Abandonment Report filed by Tenneco returning ownership back to the State by abandoning and canceling the lease. Further, the Appellees contend that they did not admit that Tenneco was the owner of the pilings by only suing Tenneco initially, because they were subsequently able to settle with Tenneco and amend their complaint naming the State as the defendant. We agree with the Appellees.
In Melerine v. State, XXXX-XXXX (La.App. 4 Cir. 11/14/00), 773 So.2d 831, 838-39, this Court found that:
Thus, the general rule governing ownership of buildings permanently attached to land with the landowner's permission by someone other than the landowner arising from La. C.C. art. 493, as interpreted by Guzzetta [v. Texas Pipe Line Co., 485 So.2d 508 (1986)], is that ownership reverts by operation of law to the landowner when the maker of the building fails to remove it after he no longer has permission to keep it on the landowner's land. Once the permission to keep the building on the land terminates, the failure to remove the building is considered as a matter of law an indication that the maker of the building intends to surrender ownership to the landowner. (Emphasis added)
Further, La. C.C. Art. 3418 states that "[a] thing is abandoned when its owner relinquishes possession with the intent to give up ownership." Comment (c) to La. C.C. Art. 3418 in accordance with La. C.C. Art. 3421 of the 1870 code further explains that an abandoned thing is one which its owner has left with the intention not to keep it any longer.
In the instant case, the well designation, State Well number 100779, indicated State ownership. State Lease no. 4176 dated August 15, 1963 granted Tenneco permission to drill for oil. Tenneco also *1149 obtained a work permit from the Army Corps of Engineers and from the State of Louisiana. Tenneco drilled the hole and found that it was dry. Tenneco plugged and abandoned the site on February 17, 1964, pursuant to the requirements of Statewide Order 29-B, as it existed, which clearly indicates Tenneco's intention to surrender ownership of the pilings to the State. The Department of Conservation received the Plugged and Abandoned report August 25, 1964. At that time Order 29-B did not require the removal of the oil well casing. Therefore, Tenneco had abandoned the oil casing and as a matter of law ownership reverted back to the State.
Further the lease agreement between Tenneco and the State indicates that Tenneco had abandoned the wood pilings. Paragraph 7 of the State and Tenneco Oil lease agreement states that the "[l]essee may surrender all or any portions of the leased premises at any time this lease is in effect and thereby relieved of all obligations thereafter accruing under this lease as to the portions surrendered; provided that no partial release or surrender shall reduce, or otherwise affect, the amount of rentals provided for in Article 3 of this lease." Paragraph 11 states "Lessee shall have the right during or within one year after the life of this lease to remove all Lessee property and equipment, including the right to draw all casing."
The language of the contract between the parties states that once the lease was terminated, all obligations associated with said lease also terminated. The State assumed full responsibility for the land and anything attached thereto. According to the lease agreement, Tenneco also had the right to remove the pilings within a year after the lease expired if it desired to maintain ownership of the wood pilings. However, Tenneco has not elected to remove or claim any of the structures in almost 30 years. Therefore, we find that the district court did not err in holding that the State is the owner of the wood pilings.
Second we will discuss who had garde of the wood pilings. The State argues that Tenneco demonstrated garde over the pilings after the accident by removing the pilings post-accident. The Appellees argue that Tenneco did not remove the pilings after the accident as an admission of garde over the pilings or culpability, but rather Tenneco did so to avoid the costly expense of litigation in contesting the State's request to have the pilings removed. Further, the Appellees argue that the lease states that Tenneco did not have any right of control over the pilings or property after the lease was terminated for one year, and that the State continued to lease the surrounding water bottoms. In Melerine, this Court relied on the decision it rendered in Socorro v. Orleans Levee Board, 561 So.2d 739 (La.App. 4 Cir.1990) aff'd in part, rev'd in part on other grounds, 579 So.2d 931 (La.1991), which directly addressed the issue of custody:
The liability imposed by Civil Code Article 2317 is grounded in the custody or control of a defective thing. For purposes of that article custody means, `supervision and control'....
The things in one's care are those things to which one bears such a relationship as to have the right of direction and control over them and to draw some kind of benefit from them. (Emphasis added) This relationship would ordinarily be associated with ownership but the guardianship will also belong to the bailee, the lessee, the usufructuary, the borrower for use and the repairman, among others.... The owner may transfer the guardianship by *1150 transferring the thing to another who will bear such relationship to the thing as to himself have the care of it. (Emphasis in original)
As a general rule, however, it can be said that guardianship rests with the owner until it is transferred to another. Jacobs v. Spinnakers, 474 So.2d 1019 (La.App. 5th Cir.1985).
Further, a defendant's `garde' of a thing can form the basis for fault in negligence under a duty-risk analysis, the only difference being the burden of proof. Bush v. Lafayette Insurance Co., 477 So.2d 900 (La.App. 4th Cir.1985).
Melerine, 773 So.2d at 840.
In the instant case, Tenneco had custody of the pilings during the existence of the lease; however, at the time of the accident, thirty years after the termination of the lease, the State was the only entity who the had right of control or the ability to derive any benefit from the structure. Therefore, it was not improper for the district court to find that the State had garde over the wood pilings.

STATE IMMUNITY
The second issue we will discuss is whether La. R.S. 9:2791 and La. R.S. 9:2795 provide immunity to the State of Louisiana from liability to the fisherman. The State argues that it is immune from liability under La.R.S. 9:2791, because the "commercial enterprise" test adopted by this Court in Melerine is unduly restrictive and inhibits the purposes of the immunity statutes.
The Appellees argue that the immunity statutes apply only to instrumentalities existing in the true outdoors, and that oil well structures are remnants of commercial activity and not instrumentalities encountered in the true outdoors. The Appellees further argue that they were on a commercial venture, and not engaged in a recreational activity.
La. R.S. 9:2791(A) states in pertinent part that:
"[a]n owner, lessee, or occupant of premises owes no duty of care to keep such premises safe for entry or use by others for hunting, fishing, camping, hiking, sightseeing or boating or to give warning of any hazardous conditions, use of, structure or activities on such premises to persons entering for such purposes." (Emphasis added)
La. R.S. 9:2795(B)(1) and (E)(1) provide:
B. (1) Except for willful or malicious failure to warn against a dangerous condition, use, structure, or activity, an owner of land, except an owner of commercial recreational developments or facilities, who permits with or without charge any person to use his land for recreational purposes as herein defined does not thereby:
a. Extend any assurance that the premises are safe for any purposes.
b. Constitute such person the legal status of an invitee or licensee to whom a duty of care is owed.
c. Incur liability for any injury to a person or property caused by any defect in the land regardless of whether naturally occurring or manmade.
E. (1) The limitation of liability provided in this Section shall apply to any lands or water bottoms owned, leased, or managed by the Department of Wildlife and Fisheries, regardless of the purposes for which the land or water bottoms are used and whether they are used for recreational or nonrecreational purposes. (Emphasis added)
The district court found that the defense raised by the State regarding the recreational immunity statutes was invalid. We *1151 agree. Previously, in Melerine, this Court stated:
[W]e have found that the State is liable as the owner of the abandoned oil well casing itself, not just the owner of the water bottom.... The well-recognized purpose of the Recreational Use Immunity Statutes is `to induce private owners of large acreages to open expanses of undeveloped lands for public outdoor, open land recreational purposes.' Verdin v. Louisiana Land and Exploration Co., 693 So.2d 162, 165 (La. App. 4 Cir. 3/12/97). Application of the statutes to immunize the State from liability in this case would not further that purpose....
More importantly, it is well settled that one of the requirements for application of the Recreational Use Immunity Statutes is that `the injury-causing instrumentality must be of the type normally encountered in the `true outdoors' and not of the type usually found in someone's backyard'. Id. at 67. In Eschete v. Mecom, 509 So.2d 840 (La.App. 1 Cir.1987), writ denied, 513 So.2d 821 (La.1987), the court found that oil well cribbings submerged underwater in a dead-end canal connected at one end of the intercoastal canal were not instrumentalities normally encountered in the true outdoors because they resulted from a commercial enterprise. Id. at 843. Thus, the Recreational Use Immunity Statutes do not apply to this case, involving an abandoned oil well casing resulting from a commercial enterprise.
Melerine 773 So.2d at 845-846.
The State knew the well location presented an unreasonable risk of harm as Tenneco clearly informed the State that the casing was not removed. The State's failure to warn against the dangerous oil structure was "willful," and therefore, the State is not entitled to recreational use immunity under La. R.S. 9:2795. Price v. Exxon Corp., 95-0392, p. 11 (La.App. 1 Cir. 11/9/95), 664 So.2d 1273, 1281. The Appellees as commercial fisherman were licensed and invited to the well site areas by the State.
The above-described statutes only apply to recreational activities. In the instant case, the boating expedition was for commercial purposes the night before the shrimp season opened. Additionally, the recreational use statute provisions granting limitation of liability respecting lands or water bottoms owned, leased, or managed by the Department of Wildlife and Fisheries does not confer limitation of liability upon state political subdivisions other than the Department. Bradshaw v. State, through the Department of Wildlife and Fisheries, 616 So.2d 799 (La.App. 2 Cir.1993). The fault in this case is not attributable to the Department of Wildlife and Fisheries, it is attributable to other subsidiaries or departments such as the Department of Conservation. Therefore, provisions of La. R.S. 9:2791 and La. R.S. 9:2795 do not absolve the State of its liability in this matter.

FAULT
The third issue we will address is whether the State or the boat operators and passengers were responsible for the allision. The State argues that it is not at fault for the allision because general maritime law applies, and not state tort law. The State also argues that the boat crewmembers were completely at fault, comparatively at fault, or negligent because the pilings were visible and they had knowledge of the pilings location.
The Appellees argue that the casing and pilings created an unreasonable risk of harm, because the pilings were only inches out of the water, without markings, lighting or reflectors, and there were several more just below the water. They *1152 argue that this was the sole cause of the accident. The Appellees further argue that they took all necessary and reasonable measures under the circumstances. Specifically, they contend that they were traveling at a reasonable rate of speed, and that the severity of the accident was caused by the fact that the vessel was stopped dead upon impact, imbedding its hull upon the obstruction. They also contend that no one had prior knowledge of the existence of the obstruction except Clark Fontaine who realized weeks subsequent to the accident that he had seen the pilings as a teenager fifteen to twenty years earlier. The Appellees argue that ultimately it was the State that knew or should have known of the risk posed by the cluster of pilings and that the State failed to take any steps to prevent the damage caused by the pilings.
The owner or person having custody of immovable property has a duty to keep such property in a reasonably safe condition. This person must discover any unreasonably dangerous condition on the premises and either correct the condition or warn potential victims of its existence. This duty is the same under both the strict liability theory of LSA-C.C. art. 2317 and the negligence liability theory of LSA-C.C. art. 2315.
There is a difference in proof between these two theories of liability, however, in that under LSA-C.C. art. 2315, the plaintiff must show that the owner or custodian either knew or should have known of the risk, whereas under LSA-C.C. art. 2317, the plaintiff is relieved of proving scienter on the part of the defendant.
Under either theory of liability, the plaintiff has the burden of proving that: (1) the property which caused the damage was in the custody of the defendant; (2) the property was defective because it had a condition that created an unreasonable risk of harm to persons on the premises; and (3) the defect in the property was a cause-in-fact of the resulting injury. [Citations omitted]
Madden v. Saik, 511 So.2d 855, 857 (La. App. 4 Cir.1987).
The district court applied the duty-risk analysis to determine whether the State had liability in the following manner: (1) Was the conduct of which the plaintiff complains a cause-in-fact in the resulting harm? (2) What, if any, duties were owed by the respective parties? (3) Whether the requisite duties were breached? (4) Was the risk of harm caused, within the scope of protection afforded by the duty breached? (5) Were actual damages sustained?
The district court also used the following standard to find negligence: that the Appellees had to show that the thing in question created an unreasonable risk of injury, that the State knew or should have known of the risk, and that the State failed to make the condition safe to prevent the damage.
Based on Madden, we agree with the cogent findings of the district court. The district court found that the evidence established that the well and the pilings in question were located in the navigable waters of Bastian Bay on State owned water bottoms at the time they were constructed, at the time the well was plugged and abandoned in 1964-65, and at the time of the accident in 1995.
The State argues that Tenneco had a duty under La. R.S. 31:122 to restore the surface of the leased premises to it's original condition. La. R.S. 31:122 states that "[a] mineral lessee is not under a fiduciary obligation to his lessor, but he is bound to perform the contract in good faith and to develop and operate the property leased as a reasonably prudent operator for the mutual benefit of himself and his lessor. Parties *1153 may stipulate what shall constitute reasonably prudent conduct on the part of the lessee."
The comments under Section 122 specifically state that the obligation of the lessee to restore the surface of the leased premises on completions of operations may be viewed as a part of this general standard, and it is established that the mineral lessee must restore the surface even though the lease contract is silent. The Louisiana Supreme Court... ha[s] recognized the contractual duty of a mineral lessee to restore the surface upon completion of operations. See: Caskey v. Kelly Oil Company, 737 So.2d 1257 (La.1999) ... The Louisiana Supreme Court in Frey v. Amoco Production Company, 603 So.2d 166 (La. 1992) specifically stated that in Louisiana a mineral lease is interpreted so as to give effect to the covenants implied in every lease.
Thus, the Louisiana courts have held that every mineral lease has an implied obligation under the mineral code to restore the surface of the premises upon completion of the operations.
Isadore v. Prove Offshore, L.L.C., 2001-777 (La.App. 3 Cir. 12/19/01), 815 So.2d 876.
Therefore, under La. R.S. 31:122, Tenneco did have a duty to restore the surface of the leased premises and remove the pilings. However, the State had a duty to demand and ensure removal of the pilings within a reasonable time after the termination of the lease, if it did not want to acquire ownership of the immovable. La. C.C. art. 493; see also, Melerine, supra. La. C.C. art. 493 states in pertinent part:
When the owner of buildings, other constructions permanently attached to the ground, or plantings no longer has the right to keep them on the land of another, he may remove them subject to his obligation to restore the property to its former condition. If he does not remove them within 90 days after written demand, the owner of the land acquires ownership of the improvements and owes nothing to their former owner. (Emphasis added)
The State did not demand removal of the pilings from Tenneco until after the accident. The State had ninety days from the termination of the lease to make such a demand, or at most one year from the termination of the lease because the lease agreement granted the lessee an opportunity to remove immovable property from the leased premises in order to retain ownership. Additionally, the owner of immovable property has a duty to keep property in a reasonably safe condition or warn potential users or victims of its existence. Smith v. State through Dept. of Public Safety, 620 So.2d 1172 (La.App. 1 Cir. 1992). The State has a clear duty to warn against and correct dangerous conditions when it has actual or constructive notice.
Based upon the evidence presented at trial, the district court found that the State had both actual and constructive notice of the well site, the piling and the casing.
Tenneco filed its plug and abandonment report with the State and clearly indicated on the face of its report that no well casing was pulled. This constituted actual notice for the State that there remained a hazardous condition, because the plug and abandon report clearly stated that the casing was not pulled.
Constructive notice was also proven. Based upon the testimony of the State's designated representative, Bruce Campbell, the condition of the well casing and the five remaining pilings would never have been allowed to remain on the State's property if the State had properly inspected its work. The State approved Tenneco's *1154 actions by its approval of Tenneco's plugged and abandoned work. Tenneco did not make any false representations to the State. Tenneco preformed its plugged and abandoned work under the State's directions and the State approved and accepted the performance. The State knew or should have known of the condition of its well site.
Appellees' expert witness, Mr. Camp, explained that the State routinely surveys an area before granting an oyster lease and that he reviewed the notes of a survey of the area where the accident occurred. He testified at trial that the survey occurred years prior to the August 1995 allision, which placed the State employee within one hundred and nine feet of the pilings while performing a daylight survey. These State employees should have discovered and reported this hazard so that it could have been either cleared or marked. Therefore, the district court did not err by finding that the State did not act responsibly under the circumstances.
The district court was not manifestly erroneous for finding that the Appellees were not contributorily negligent, and specifically that Donald Anderson, the pilot of the vessel, and Clark Fontaine, Jr., the person operating a spotlight and keeping lookout, were not at fault.
The Appellees were traveling at a reasonable rate of speed, about fifteen miles per hour. Further, the act of traveling at night in a watercraft is not negligence in and of itself. The district court found that the Appellees took adequate precautions and were particularly attentive and cautious to their surroundings, especially keeping distant from the land areas to the west.
Additionally, the State argues that Mr. Fontaine had prior knowledge of the area, and knew of the existence and hazard of the pilings. Mr. Fontaine testified that he might have seen the well location as a teenager. Mr. Fontaine was thirty-one years old at the time of the accident. Mr. Fontaine was acting as lookout at the time of the accident using a very powerful spotlight. The fact that Mr. Fontaine did not recall the exact location of a well he may have seen many years ago does not create negligence on his part. Therefore, we agree with the factual findings by the district court that the Appellees conducted themselves in a reasonable manner and were not contributorily negligent in causing the incident, and that the State was at fault for the allision.

DAMAGES
The fourth issue we will consider is whether the damages awarded were excessive. The State argues that the damages awarded by the district court were excessive. The Appellees argue that the damages awarded were reasonable and should not be disturbed on appeal. The district court cogently analyzed the specific damages for each Appellee, with which we agree and find no error. All presented expert medical testimony and evidence, as well as documentation of lost wages, which demonstrated that the injuries were the result of the accident. Based on the nature and the proximity in time in which the injuries occurred, it is clear that the Appellees' injuries were a result of the accident.
Determination of the damage award is within the purview of the factfinder and cannot be disturbed on review unless the record clearly reveals that the trier of fact abused its discretion in making the award. Gaston v. G & D Marine Services, Inc., 93-0182 (La.App. 4 Cir. 1/19/94), 631 So.2d 547. Absent manifest error credibility determinations are left to the discretion of the district court. Courteaux v. State through Department of Transportation and Development, 99-0352, *1155 99-0353 (La.App. 4 Cir. 9/22/99), 745 So.2d 91. Because oftentimes in this case, there was no contradictory testimony or evidence submitted, we see no abuse of discretion in the general damages awarded by the district court. The following are the specific arguments raised by the State and the Appellees, and the reasoning of the district court with respect to each Appellee.

Clark Fontaine
The State argues that Mr. Fontaine complained of continued pain since August 19, 1995; however, he did not see any medical doctor for three years, from July 23, 1996 to March 10, 1999. Further, the State argues that the disc symptoms preexisted the accident and that orthopedic treatment ended as he settled with Tenneco in August 1996, and that he was not a surgical candidate. Also, the State argues that Mr. Fontaine's earning capacity was not diminished by $35,000 in the past and $100,000 in the future, because his federal income tax returns prove that his income increased in each year after 1994, the year prior to the accident.
The Appellees argue that Mr. Fontaine did not spend money on extensive doctor's visits when he was told that his only choice from a medical standpoint was to undergo surgery, and that the treating orthopedic physician, Dr. John Watermeier, confirmed this medical recommendation. The Appellees also argue that the testimony of Dr. Watermeier established that Mr. Fontaine met the criteria as a surgical candidate. Further, the Appellees argue that the severe pain suffered by Mr. Fontaine has worsened and surgery is inevitable. The Appellees further argue that Mr. Fontaine was in good health prior to the accident, and that the accident caused him severe cervical damage as a result of his being propelled forward at impact, and his head being struck and snapped back by a two-inch aluminum pipe rendering him immediately unconscious. Additionally, the Appellees contend that Mr. Fontaine's tax returns demonstrate that he would have been earning more had he not been injured in this accident and not been forced to hire more labor to help him perform his fishing operations.
The following is the reasoning of the district court as to Mr. Fontaine:
Mr. Fontaine explained that upon impact he was thrown violently forward. His face and head struck a metal pole, jerking his head backwards and rendering him unconscious. He was transported by ambulance to Meadowcrest Hospital for treatment. As a result of the allision, Mr. Fontaine sustained a concussion, as well as, injury to his neck and shoulder. He experienced severe head and neck pain radiating into his shoulder, arm and hand. Mr. Fontaine was treated by his family physician, Dr. John Knox, and then later by an orthopedic specialist, Dr. John Watermeier. Dr. Watermeier testified to the Court as an expert in the areas of orthopedic medicine and orthopedic surgery. In the course of Dr. Watermeier's treatment of Mr. Fontaine, an MRI was ordered. The MRI showed a calcified herniation at the C3-4 level with impingement upon Mr. Fontaine's spinal cord. A subsequent EMG and CT scan of Mr. Fontaine's neck showed similar findings. Dr. Watermeier informed Mr. Fontaine that he had only two choices, live with the pain or undergo a one level anterior cervical fusion, a major surgery performed under general anesthesia. Mr. Fontaine elected not to undergo surgery at that time, hoping that he could manage the pain.
Mr. Fontaine testified that he still experiences severe neck pain with head *1156 aches, [sic] shoulder pain and arm pain. He also explained that the condition has continued unabated since the August 1995 incident and has only gotten worse with the passage of time.
The State argues that the herniation in question pre-existed the August 1995 incident and therefore it is not responsible for anything related to it. However, Dr. Watermeier testified that herniated and degenerative disk conditions may exist in a person but not cause any problems or pain until made symptomatic by some traumatic event. The Court is persuaded by the opinion of the only expert testifying on this subject matter. Dr. Watermeier testified that even if the herniation pre-existed the accident, it was more probable than not that the disc herniation and the resulting symptoms for which he treated Mr. Fontaine were made symptomatic and thus caused by the August 1995 allision. In the instant manner, the State failed to produce any evidence that Mr. Fontaine had neck symptoms other than one very minor incident occurring many years prior to 1995 and lasting only a few weeks. The State certainly did not produce any evidence of prior injury or symptoms anywhere near the magnitude of the problems Mr. Fontaine had after the August 1995 allision.
The law on this point is well settled, a defendant takes its plaintiff as he finds him. Every bit of evidence presented at trial indicates that Mr. Fontaine only experienced these severe pain symptoms after the August 1995 allision. In the personal injury suit, the test for determining the relation between the accident and subsequent injuries is whether the plaintiff proved through medical testimony that it was more probable than not that the subsequent injuries were caused by the trauma suffered in the accident. Mart v. Hill, 505 So.2d 1120 (La.1987). A plaintiff is aided in establishing this burden by the legal presumption that a medical condition producing disability is presumed to have resulted from an accident if, before the accident, the injured person was in good health, but shortly after the accident, the disabling condition manifested itself. Heath v. Northgate Mall, Inc., 398 So.2d 132 (La.App. 3 Cir.1981).
The plaintiff has the burden to prove by a preponderance of the evidence that he will have a future course of treatment or surgery. Stiles v. K Mart Corp., 597 So.2d 1012 (La.1992). The Court finds that this burden has been met by Mr. Fontaine in the instant manner. Mr. Fontaine's last visit with Dr. Watermeier was in March of 1999. Dr. Watermeier testified that the only remaining course of treatment is still surgery. The Court finds Mr. Fontaine's testimony on this subject credible and persuasive. He states that he plans on having the surgery in the next couple of years because his situation is only getting worse. Therefore, any damage award, including medical bills, general damages and lost income/earning capacity will reflect his need for a future surgery. Kreher v. Semreh Club, 694 So.2d 1222 (La. App. 4 Cir.1997); Angeron v. Martin, 649 So.2d 40 (La.App. 1 Cir.1994); Burnaman v. Risk Management, Inc., 698 So.2d 17 (La.App. 3 Cir.1997).
Mr. Fontaine presented evidence indicating $8,617.75 in past medical bills. The Court so awards these expenses to Mr. Fontaine as damages. The Court also awards $24,942.00 in future medical damages to Mr. Fontaine based upon the need for a future surgery.
The Court awards Mr. Fontaine general damages for past and future pain and suffering in the amount of $200,000.00....

*1157 As a result of the injuries Mr. Fontaine sustained, Dr. Watermeier recommended that he avoid any heavy work, as well as, any repetitive overhead work, bending, stooping, and lifting. Dr. Watermeier further testified the Mr. Fontaine's restrictions were the same with or without surgery. Mr. Fontaine testified that he was a self-employed commercial fisherman at the time of the accident and remains so to this day. He owns his own shrimp boat, rigged so that he could operate the vessel with a one man crew, himself. He further testified that this changed after the accident. Although he was able to continue shrimping, he could only do so by hiring one, sometimes two, deckhands to do any and all manual labor. This significantly cut into his profits. Mr. Fontaine also testified that he was not able to do any mullet finish [sic] at all after the accident because of the labor demands that type of fishing placed upon him. Based upon the testimony of Mr. Fontaine and Dr. Watermeier, as well as, the earning documentation he introduced at trial, the Court finds that Mr. Fontaine has suffered damages to his past and future income and earning capacity as a result of the August 1995 allision.
The law is clear that a claim for the loss of earnings need not be proven with mathematical certainty, but only by such proof as reasonably establishes plaintiff's claim. Veazey v. State Farm Mut. Auto Ins., 587 So.2d 5 (La.App. 3 Cir. 1991). The trial court should thus ask itself what plaintiff might be able to have earned but for his injuries and what he may now earn given his resulting condition. Pierce v. Milford, 688 So.2d 1093, 1095 (La.App. 3rd Cir.1996), citing Finnie v. Vallee, 620 So.2d 897 (La.App. 4th Cir.1993), writ denied, 625 So.2d 1040 (La.1993).
Based upon this testimony and evidence, the Court finds that Mr. Fontaine has sustained damages to his past income and earning capacity in the amount of $35,000.00 and to his future income and earning capacity in the amount of $200,000.00. [sic]

Donald Anderson
The State argues that Mr. Donald Anderson complained of pain from the accident, but did not seek medical attention in the period of July 3, 1996 through March 2, 1999. The State argues that Mr. D. Anderson made a full recovery, suffered no permanent disability, could continue with regular employment, and failed to attend physical therapy. The State further argues that Mr. D. Anderson may have been injured in the accident, but that his complaints of SI joint pain were not until January 1996 and not related to the accident. The State also contends that Mr. D. Anderson is long recovered because he did not have doctor visits for the balance of 1996, 1997, 1998, and only one pretrial visit in March 1999. The State further contends that Mr. D. Anderson did not introduce any income or fishing ticket documentation and therefore should not have been awarded lost wages.
The Appellees argue that Mr. D. Anderson was awarded damages not only for his spinal injuries, but injuries to his face which was crushed into a metal pole breaking his cheekbone and jaw, cracking his teeth, and causing hemorrhaging in his right eyeball. Further, the Appellees contend that Mr. D. Anderson sufficiently demonstrated an economic loss because he missed all of the shrimp season lasting from August 1995 to January 1996, the entire 1995 mullet fishing season, and part of the 1996 shrimp season beginning in May of 1996.
*1158 The following is the reasoning of the district court as to Mr. D. Anderson.
Mr. Anderson explained that upon impact he was thrown violently forward. He was behind the steering console and his face and head struck a metal pole as he was thrown over it. He was transported by ambulance to the Port Sulphur Comprehensive Care Center for treatment. As a result of the allision, Mr. Anderson sustained injuries to his whole body, including a broken cheekbone, broken jaw, cracked teeth, swollen face, hemorrhaging into his right eyeball, and damage to back and neck. The blow Mr. Anderson took to his face was particularly devastating and painful. Mr. Anderson was treated by his family physician, Dr. Logaglio, several dentists, and an orthopedic specialist, Dr. Watermeier.
Dr. Watermeier treated Mr. Anderson from September of 1995 till [sic] July of 1996. During the course of this treatment Mr. Anderson underwent an MRI, a sacroiliac joint arthrogram (dye injected into the joint by needle followed by a CT scan) and a series of marcaine injections. Dr. Watermeier diagnosed Mr. Anderson with a cervical strain, a lumbar strain and sacroiliac joint syndrome. Dr. Watermeier attributed these injuries to the August 1995 allision.
The Court finds that Mr. Anderson suffered a significant degree of pain and suffering as a result of this incident. His injuries made it particularly hard to even eat or talk. He experienced severe back and neck pain, with numbness into his shoulder and arm. He had difficulty with bowel and kidney functions and had weakness in both legs. Mr. Anderson testified that he still experiences back, jaw and teeth [pain] to the present day. Given the severity of his injuries, the Court feels that $100,000.00 [sic] is an appropriate award for these general damages.
The Court awards Mr. Anderson damages for medical expenses related to the injuries he sustained in the August 1995 allision in the amount of $7,792.52.
Mr. Anderson was a self-employed commercial fisherman at the time of the accident. As a result of the injuries he sustained, Dr. Watermeier placed him on total disability until October 23, 1995. At this time Mr. Anderson was placed on light duty. However, as Mr. Anderson explained, there was not any light duty work for him to perform. Mr. Anderson was released to regular work in July of 1996. This forced him to miss what was described to the Court as one of the best shrimping seasons in years. Although Mr. Anderson did not introduce any income or fishing ticket documentation, the Court does feel that he suffered a loss of past income/earning capacity as a result of this incident. The Court is able to make an appropriate award based upon the testimony and evidence given by the other self-employed fishermen at trial, namely Clark Fontaine and Ronald Anderson who did work during the periods Donald Anderson was forced to miss. The Court therefore awards Donald Anderson damages for the loss of past income/earning capacity in the amount of $15,000.00.

Kerri Anderson
The State argues that Ms. Kerri Anderson did not demonstrate that she was injured or required medical attention, but for three torn vaginal stitches from a recent birth.
The Appellees argue that the damages awarded to Ms. Anderson were justified because not only had she popped several of the vaginal stitches due to the impact, but also injured her stomach and back. The Appellees also argue that both her family *1159 physician and gynecologist treated her for pain.
The following is the reasoning of the district court as to Ms. Anderson:
Keri [sic] Anderson is the wife of Donald Anderson. Upon impact with the piling, she was injured from the impact of being thrown forward. Mrs. Anderson had given birth in the weeks previous to the allision. The impact tore several of the vaginal stitches that were performed after the birth of her child. She also injured her stomach and back. She was treated by her gynecologist and family doctor. She testified that her injuries resolved within a month after the accident. She did not submit any medical bills at trial. Also, she is not making any claim for lost income/earning capacity. As a result of the injuries she sustained in the allision, the Court awards Mrs. Anderson general damages in the amount of $5,000.00.

Ronald Anderson
The State argues that following emergency room treatment, Mr. Ronald Anderson did not seek treatment for two months after the accident, and was able to take his boat out for the opening days of shrimp season. The State argues that Mr. R. Anderson was diagnosed with a fractured rib, but was completely healed four months after his initial visit. The State also argues that Mr. R. Anderson failed to return to his medical doctor within the recommended three-month period. The State contends that Mr. R. Anderson's federal tax returns in 1995, 1996, 1997, failed to show amounts attributed to deckhand labor or fishing shares, and that his tax returns demonstrated that his gross income from the fishing business was the same or greater each year following the injury compared to the year 1994.
The Appellees argue that Mr. R. Anderson was thrown violently forward striking the front decking injuring his side, upper and lower back, but despite his injuries helped to free the boat. They argue that he was initially taken to Plaquemines Hospital where blood was found in his urine, and subsequently transported to Meadowcrest Hospital for further evaluation. The Appellees argue that the testimony of Mr. R. Anderson's primary treating physician, Dr. Gary Guidry, established that as a result of this accident he suffered a fractured tenth and eleventh rib on the right side as well as thoracic and lumbar strain/sprain, and that he was treated for eight months after the accident. Also, the Appellees argue that Mr. R. Anderson complained of intermittent mid and low back pain, and Dr. Guidry corroborated that it was not unusual for someone to have chronic lumbar and thoracic complaints four years post accident, but not from rib fractures. Further, the Appellees argue that Mr. R. Anderson sustained eight percent whole body impairment as a result of the injuries incurred in this accident as testified to by Dr. Guidry. Additionally, the Appellees contend that Mr. R. Anderson submitted receipts, tax returns for 1996, 1997, and 1998, and personal unrefuted testimony that served as a basis for establishing the lost wages and wage earning capacity sustained by him. They contend that Mr. R. Anderson's post-accident receipts reflect that he was only able to shrimp twenty-five percent of the 1995 shrimp season, but as a result of his injuries was denied the opportunity to earn the other seventyfive percent of the season. The Appellees contend that in the subsequent years of 1996 and 1997, loss of income capacity was calculated by deducting the amount of the reported earnings for those years respectively from the 1995 earnings. Therefore, the Appellees contend that Mr. R. Anderson's loss of wages and earning capacity *1160 surpassed that which was awarded to him although not unconscionable.
The following is the reasoning of the district court as to Mr. R. Anderson:
Ronald Anderson testified that he was seated at the front of the boat and that upon impact he was thrown violently forward causing him to strike his side on the boat. He was transported by ambulance to Port Sulphur Comprehensive Care Center for emergency treatment and was then transferred to Meadowcrest Hospital in Gretna, Louisiana. As a result of the accident, Ronald Anderson suffered a fractured 10th or 11th rib on the right side as well as a thoracic and lumbar strain/sprain. Gary Guidry, M.D., an orthopedic specialist, treated Ronald Anderson through April 17, 1996. During that time, Ronald Anderson underwent MRI and nuclear bone scan. [sic] The findings on MRI indicated disc narrowing and end plate irregularities, which were felt to be preexisting. Dr. Guidry testified to the Court as an expert in the areas of orthopedic medicine and orthopedic surgery. Dr. Guidry opined that while it would be unusual for rib fractures to be symptomatic for four years, it would not be unusual for someone to have chronic lumbar and thoracic complaints as a result of an accident such as sustained by Mr. Anderson. Additionally, Dr. Guidry determined that Ronald Anderson sustained 8% whole body impairment as a result of the injuries incurred in this accident. Dr. Guidry limited the repetitive bending, stooping and lifting of Mr. Anderson. Additionally, the testimony of Ronald Anderson established that he still suffered severe, intermittent mid and low back pain through the time of trial (four years post-accident) for which he was offered no treatment other than over-the-counter pain relievers.
Ronald Anderson presented evidence indicating $4,170.48 in past medical bills. The Court so awards these expenses to Ronald Anderson as medical damages.
The Court awards Ronald Anderson general damages for past and future pain and suffering in the amount of $71,909.16 [sic] based upon the testimony of Dr. Guidry and Ronald Anderson and the medical records from various medical providers rendering treatment to Mr. Anderson which is appropriate to compensate plaintiff for his personal injuries. Sanderford v. Lombard, 96-1171 (La.App. 4th Cir. 12/11/96) 685 So.2d 1162 [105,000 awarded to a woman who sustained 2 bulging discs with residual pain].
As a result of the injuries Ronald Anderson sustained, Dr. Guidry recommended that he avoid any heavy work, as well as, any repetitive bending, stooping and lifting. Ronald Anderson testified that he was a self-employed commercial fisherman at the time of the accident and remains so to this day. He owns his own shrimp boat, rigged so that he could operate the vessel with a one-man crew, himself. Ronald Anderson also owns a boat that he used in mullet fishing operations. Following the accident, Ronald Anderson testified that he was unable to do the heavy manual labor required to perform his occupation alone. Anderson testified that he was able to continue his shrimping operations, however, he found it necessary to hire one or two deck hands to perform the manual labor. Further, Anderson testified that the heavy labor required by mullet fishing did not allow him to pursue that avenue of fishing as fully as he had in the past. Based upon the testimony of Ronald Anderson and Dr. Guidry, as well as, the earning documentation introduced at trial, the Court finds that Ronald Anderson has suffered damages to his past and future income *1161 and earning capacity as a result of the August 1995 allision. Ronald Anderson introduced wage loss documents in the form of receipts of shrimp sales for 1995 and income tax returns for 1996, 1997, and 1998 into evidence. Furthermore, the uncontradicted testimony of Ronald Anderson serves as a basis for establishing the lost wages and wage earning capacity sustained by plaintiff.
Testimony offered by the plaintiffs proved that the 1995 shrimping season was the best ever and would have been very profitable to them as commercial fisherman, but for the accident. Mr. Anderson's tax returns for 1995 indicate reported earnings of $55,118.00. Ronald Anderson's post-accident receipts for the 1995 shrimp season total $29,242.72. Mr. Anderson testified that as a result of his injuries he was only able to shrimp 25% of the fall season. If he had been able to shrimp the remaining 75% of the season, his gross (post-accident) income from shrimping would be $116,970.88 ($29,242.72 × 4). The loss of 75% of his income $116,970.88 from that season would thus total $87,728.16. This amount, $87,728.16 represents the loss of 75% of his post-accident shrimping income for 1995. The Court is persuaded that Ronald Anderson suffered a loss for 1996 in the amount of $21,831.00 and for 1997 in the amount of $21,350.00 due to his inability to pursue his commercial endeavors as a result of the accident To calculate the loss of income capacity the Court has simply used 1995 reported earnings as a base and deducted the amount of reported Schedule C earnings for 1996 and 1997:

Reported Earnings (1995) $55,118.00 (base year)
Reported Earnings (1996) $33,287.00
Reported Earnings (1997) $42,768.00
 1996Earnings Loss from 1995 = $21,831.00
 1997Earnings Loss from 1995 = $12,350.00
Thus, the total losses are as follows: 1995-$ 87,728.16
 1996-$ 21,831.00
 1997-$ 12,350.00
 __________________
Total Wage/Capacity Loss: $121,909.16
 ___________

The Court therefore awards Ronald Anderson damages for the loss of past income/earning capacity in the amount of $71,909.16. (Emphasis supplied.)
We agree with the award to Mr. R. Anderson in the amount of $71,909.16 for the loss of past income/earning capacity, although there is a discrepancy in the calculation. Mr. R. Anderson anticipated gross earnings in the year of 1995 to be $116,970.88. He was able to earn 25% of the $116,970.88 prior to the accident. An additional 25% of his gross earnings was established to be Mr. Chad Wunstell's earnings, and were the basis to prove Mr. Wunstell's damages in lost wages for the year of 1995. Mr. R. Anderson's loss wages for 1995 amounted to $58,485.44. Therefore, the sum of Mr. R. Anderson's earnings losses for 1995, 1996, and 1997 equals $92,666.44. Thus, the district court was within its discretion to award $71,909.16 to Mr. R. Anderson, and we will not disturb this award on appeal.

Melinda Renee Clemons
The State argues that Ms. Melinda Renee Clemons had no objective symptoms, her neck pain was resolved before her visit with Dr. William Kinnard, and that Ms. Clemons sought no further medical treatment in connection with the injuries she sustained.
The Appellees argue that upon impact, Ms. Clemons' body slammed against her husband, Ronnie, in the bow of the boat and that she immediately experienced head pain. Since she was not as hurt as some of the others, she had to get into the muddy waters to help to lift the boat off of the pilings. Following the accident, she experienced pain down her neck to her lower back. She was also hospitalized for four days for a kidney infection which the treating physician explained to her was possibly related to the accident because she had gotten into the muddy waters less *1162 than one month after her recent surgery, a Caesarean section. One-month post accident, she presented to Dr. Kinnard with pain throughout her cervical, thoracic and lumbar spine. She had trouble lifting her newborn baby, and had a tingling type sensation in her toes. She was diagnosed as having a spinal strain and was advised to take anti-inflammatory medications. She continued to experience pain whether sitting in a chair or lifting her child.
The following is the reasoning of the district court as to Ms. Clemons:
Melinda Rene [sic] Clemons Anderson is the wife of Ronald Anderson. As a result of this allision Melinda Clemons Anderson was thrown suddenly and violently to the front of the vessel. Mrs. Anderson testified concerning her fears as to having to get into the water on the night of the accident to assist in freeing the boat from the piling in an effort to get help for the other injured persons.
Dr. William Kinnard, plaintiff's treating physician found that Ms. Anderson (Clemons) was suffering from a spinal strain, including low back and neck pain as well as headaches which were caused by this accident.
Based upon the testimony and evidence presented at trial, the Court finds that an award of $5,000.00 is appropriate for Melinda Rene [sic] Clemons Anderson. In accordance with the holding of the Fourth Circuit in Owens v. Anderson, 631 So.2d 1313 (La.App. 4th Cir.1994).
Evidence offered by Ms. Anderson proved that she incurred medical expenses in the amount of $430.00 as a result of this accident. The Court therefore awards Melinda Rene [sic] Clemons Anderson damages for medical expenses related to the injuries she sustained in the August 1995 allision in the amount of $430.00.

Chad Wunstell
The State argues that Mr. Chad Wunstell's fractured disc healed approximately two months after the accident, and was not caused by the boating accident.
The Appellees argue that upon impact, Mr. Wunstell was folded backwards over the deck, and he immediately felt pain from the bottom of his back up into his neck. He was transported by ambulance to Plaquemines Parish Comprehensive Care Center where he was treated and released. He had severe breathing difficulty due to several broken ribs. He continued to suffer with problems from his ribs for approximately eight months. The evidence established that as a result of this accident Mr. Wunstell suffered fractures of the seventh, eight, and ninth ribs on the right side, as well as protrusions of cervical discs at the C4-5 and C5-6 levels, which were confirmed by MRI. Four years later at trial, Mr. Wunstell continued to suffer intermittent neck and interscapular pain as well as headaches, and Dr. Guidry confirmed that it would not be unusual for a twenty-five year old man suffering from disc pathology to continue to suffer for the remainder of his life. He further confirmed that while conservative treatments are available on a symptom basis if such symptoms worsen or become chronic in nature, surgery is an alternative. Dr. Guidry assigned Mr. Wunstell a six percent whole body disability. Additionally, the Appellees contend that Mr. Wunstell's past lost income was established based upon his unrefuted testimony, and that this amount was based upon twenty-five percent of the net profits earned by Ronnie Wunstell, as the testimony reflected that Mr. Wunstell earned twenty-five percent of the profits from the commercial fishing trips, after expenses.
The following is the reasoning of the district court as to Mr. Wunstell:

*1163 Evidence regarding injuries sustained by Chad Wunstell consisted of the deposition testimony of Dr. Gary Guidry (a board certified orthopedic surgeon), medical records of various providers rendering medical treatment, as well as the trial testimony of plaintiff himself. Defendant failed to present any rebutting medical testimony at trial. Mr. Wunstell was transported by ambulance and initially received treatment at Plaquemines Parish Comprehensive Care Center. Thereafter, his care was taken over by Dr. Gary Guidry, an orthopedic surgeon.
The evidence established that as a result of this accident Chad Wunstell suffered fractures of the 7th, 8th and 9th ribs on the right side, as well as protrusions of cervical discs at the C4-5 and C5-6 levels. Dr. Guidry attributed these injuries to the accident of August 19, 1995. Dr. Charles April confirmed these findings on MRI.
At trial plaintiff testified that he still suffered from intermittent neck and interscapular pain as well as headaches. The pain suffered by Mr. Wunstell covers a period in excess of 4 years. Dr. Guidry testified that in [sic] would not be unusual for a 25-year-old man suffering from disc pathology such as Mr. Wunstell to continue to suffer for the remainder of his life. While conservative treatments are available on a symptom basis if such symptoms worsen or become chronic in nature surgery is an alternative for Mr. Wunstell. Dr. Guidry assigned a 6% whole body disability to Mr. Wunstell.
Based upon the nature of his injuries, the long-standing nature of Mr. Wunstell's complaints and the disability rating assigned by Dr. Guidry, the Court finds that an award of $100,000 [sic] is appropriate in this case. Sanderford v. Lombard, 96-1171 (La.App. 4th Cir.12/11/96) 685 So.2d 1162 [$105,000 awarded to a woman who sustained 2 bulging discs with residual pain].
Evidence offered at trial indicated that Mr. Wunstell incurred medical expenses totaling $4,549.62. The Court therefore awards Chad Wunstell damages for medical expenses related to the injuries in the August 1995 allision in the amount of $4,549.62.
Past lost income in the amount of $29,242.72 was established at trial based upon the uncontradicted testimony of Chad Wunstell. This amount was based upon 25% of the gross income earned by Ronnie Anderson, as the testimony reflected that Chad Wunstell was to be paid 25% of the catch from the commercial fishing trips. The Court awards Chad Wunstell damages for the loss of past income/earning capacity as better estimated in the amount of $29,242.72.

Connie Wunstell
The State argues that Ms. Connie Wunstell worked the opening day of the shrimp season in place of her husband. She sought medical treatment one month after the accident. She had mild cervical and lumbar strain. She was released from medical care on October 26, 1995, approximately three weeks later. Ms. Wunstell sought no additional medical treatment, and exhibited no objective signs. In March 1996, she suffered back pain from yard work, which aggravated the pre-existing degenerative condition, which predated the boating accident.
The Appellees argue that Ms. Wunstell was thrown in the allision, into her husband, Chad, hitting her head on him and was scraped and bruised on the front of her body. She experienced pain in her knees, lower back, and legs. Ms. Wunstell was treated by Dr. Kinnard who opined that she suffered cervical and lumbar strains as a result of this accident as well *1164 as an aggravation of a pre-existing back condition, a Schmorl type herniation, which pre-disposes her to future problems. Dr. Kinnard treated Ms. Wunstell for eleven months.
The following is the reasoning of the district court as to Ms. Wunstell.
Connie Wunstell was treated by Dr. William Kinnard, a board certified orthopedic surgeon, for injuries related to this accident. Dr. Kinnard opined that Ms. Wunstell suffered cervical and lumbar strains as a result of this accident as well as an aggravation of a pre-existing back condition (a Schmorl type herniation) a condition that makes her more susceptible to traumatic injury at that level. Dr. Kinnard treated Connie Wunstell until July 18, 1996 or some eleven months after the accident.
The Court awards pain and suffering in the amount of $15,500.00, which is appropriate for an 11 month cervical and lumbar strain. Medice v. Delchamps, Inc., 96-1868 (La.App. 4th Cir.4/30/97) 694 So.2d 528 [$6,000 for 3 months soft tissue injury]; Jeanpierre v. Mikaelian, 97-1850 (La.App. 4 th Cir. 2/25/98) 709 So.2d 15 [$7,500 for five and a half month soft tissue injury and $7,500 for six month soft tissue injury].
The evidence before this Court shows that Mrs. Wunstell incurred $1,988.16 in medical expenses as a result of this accident. The Court thereby finds for Mrs. Wunstell in said amount. The medical bills relating to these expenses were introduced as evidence at trial.

Albert Ragas
The State argues that Mr. Albert Ragas was instructed by the emergency room physician to follow-up with his personal physician, however, he sought no further medical treatment.
The Appellees argue that Mr. Ragas was standing at the rearstarboard side of the boat just prior to the allision. He was thrown onto the floor and felt pain in his left side. He was taken to Plaquemines Parish Hospital where he was treated and released. He continued to have problems from the bruised ribs for approximately three to four months and every once in a while he gets stiff. Additionally, they contend that he missed ten days of the 1995 shrimping season and sustained lost earnings in the amount of $4,000 as a result of this accident.
The following is the reasoning of the district court as to Mr. Ragas.
As a result of the accident, Mr. Ragas sustained bruised ribs and cervical and lumbar pains. He was treated and released in the emergency room of Plaquemines Parish Comprehensive Care Center the night of the accident. The Court awards pain and suffering in the amount of $6,000.00 and is appropriate to compensate Mr. Ragas for his injuries. Medice v. Delchamps, Inc., 96-1868 (La. App. 4th Cir.4/30/97) 694 So.2d 528 [$6,000 for 3 months soft tissue injury].
Evidence offered indicated that Mr. Ragas incurred medical expenses that totaled $227.00. The Court therefore awards Mr. Ragas medical expenses in said amount.
Ragas testified that as a result of his injuries, he could not perform some of his employment as a commercial fisherman with Mr. Taliancich. Ragas further testified that he sustained lost earnings in the amount of $2,000.00 as a result of this accident. The Court therefore awards Albert Ragas for the loss of past income/earning capacity in the amount of $2,000.00.

DECREE
While the Reasons for Judgment differs in amounts awarded to plaintiffs from the *1165 awards indicated in the judgment, we are, of course, bound by that awarded by the judgment. Therefore, for the foregoing reasons, we hereby affirm the judgment of the district court.
AFFIRMED.
TOBIAS, J., concurs.
TOBIAS, J., concurs.
I respectfully concur in the result.
The issue in these consolidated cases is not whether this court agrees with the apportionment of fault or assessment of damages by the trial court. Rather, the issue is whether the trial court was manifestly erroneous or clearly wrong. The trial court's detailed reasons for judgment, as quoted by the majority, are adequately supported by the record. Neither the allocation of fault or assessments of damages are manifestly erroneous or clearly wrong. Although the awards stated in the reasons for judgment are not consistent with the amounts stated in the judgment, the judgment prevails over the reasons.

ON APPLICATION FOR REHEARING
CHARLES R. JONES, Judge.
The Application for Rehearing filed by the State of Louisiana through the Department of Natural Resources (hereinafter "State") is granted for the sole purpose of clarifying our previous decision.
The State argues that general maritime law was the applicable law in this case citing Fox v. Southern Scrap Export Co., Ltd., 618 So.2d 844, 846 (La.1993), which states that "[a] tort action falls within admiralty or maritime jurisdiction if the tort occurred in navigable waters and had a significant relationship to a traditional maritime activity." We have reviewed this case, but do not find that it overrules Adams v. Chevron U.S.A., Inc., 589 So.2d 1219 (La.App. 4 Cir. 11/14/91). Adams states that "[m]aritime tort cases apply the general maritime law, not state tort law, unless there are significant state policy considerations involved." Id. at p. 1222. Clearly, there are significant state policy considerations involved in the regulation of navigable waters in which the State encourages commercial use of said waters.
Thus, we hereby affirm our previous judgment.
TOBIAS, J., concurs.
TOBIAS, J., CONCURS.
I respectfully concur in the granting of the rehearing to clarify the majority's opinion. I adhere to the reasons assigned in my original concurrence.