886 So.2d 1283 (2004)
Leon L. GIORGIO, Jr.
v.
ALLIANCE OPERATING CORPORATION, Gulfstream Resources, Inc., Burlington Resources, et al., Chevron USA, Inc., Superior Oilfield Services, Inc., State of Louisiana, Through its Department of Natural Resources, Lloyds Underwriters at Lloyds, et al.
Jacques A. Sanborn
v.
Alliance Operating Corporation, Gulfstream Resources, Inc., Burlington Resources, et al., Chevron USA, Inc., Superior Oilfield Services, Inc., State of Louisiana, Through its Department of Natural Resources, Lloyds Underwriters at Lloyds, et al.
Nos. 2003-CA-1832, 2003-CA-1834.
Court of Appeal of Louisiana, Fourth Circuit.
November 10, 2004.
Rehearing Denied December 3, 2004.
*1284 Daniel L. Dysart, Paul A. Tabary III, Leonce J. Malus III, Dysart & Tabary, L.L.P., Chalmette, Louisiana, for Plaintiff/Appellee, Jacques A. Sanborn.
David L. Colvin, David Covin & Associates Gretna, Louisiana, for Plaintiff/Appellee, Leon L. Giorgio, Jr.
Charles C. Foti, Jr., Attorney General, State of Louisiana, Richard P. Ieyoub, Former Attorney General State of Louisiana, G.A. Manthey, Jr., Assistant Attorney General State of Louisiana, William S. Culver, Jr., Assistant Attorney General State of Louisiana, Louisiana Dept. of Justice Litigation Division, New Orleans, Louisiana, for Defendant/Appellee, State of Louisiana through the Department of Natural Resources.
(Court composed of Judge JAMES F. McKAY III, Judge TERRI F. LOVE, Judge MAX N. TOBIAS, JR.).
JAMES F. McKAY III, Judge.
The defendant, the State of Louisiana, through the Department of Natural Resources, appeals a trial court judgment in favor of the plaintiffs, Leon Giorgio and Jacques Sanborn. We affirm.

FACTS AND PROCEDURAL HISTORY
On the afternoon of March 14, 1998, the "Jo-Le," a thirty-eight foot Bertram sport fishing boat, left dock at Chalmette and headed for the waters of Breton Sound via the Mississippi River Gulf Outlet. Aboard the vessel were one of its owners, Leon Giorgio, his good friend, Jacques Sanborn, and Sanborn's fourteen-year old son, Brett. The group's itinerary was to do some fishing and then meet Giorgio's business partner and co-owner of the vessel at a restaurant in Venice.
After some fishing, with darkness approaching, the group decided to head towards Venice. The "Jo-Le" was on course to Breton Island when she violently crashed into a set of pilings adjacent to a large, unlit oil production platform. At the time of the accident, Giorgio had a visual fix on the lighted Kerr-McGee tower located on Breton Island and had just adjusted the vessel's radar from short range (1/4 to 1/2 miles) to long range (24 miles) to get a fix on his destination.
The site of the accident was originally a construction put on State lease 8342, granted to Gulf Oil Company in 1979. *1285 Gulf Oil received a permit from the United States Army Corps of Engineers and the Louisiana State Department of Conservation to drill three wells and erect a production platform. The wells were drilled in 1981, and the platform was installed in 1982 by Chevron Oil Company, Gulf Oil's successor in title to the lease. In 1988, the lease was sold to Alliance Oil Company, which in turn sold the lease to Superior Oil Company in 1992. The lease expired on July 30, 1993 and the State Mineral Board authorized the release of the lease on December 8, 1993. The release in favor of the State of Louisiana was executed by Superior Oil Company on April 28, 1994 and recorded on May 3, 1994. The release provided that Superior release, relinquish, surrender and quit claim to the State Mineral Board any and all right, title and interest whatsoever presently owned by Superior in and to State Lease 8342. Lease 8342 was declared orphaned in January 1995, but there was no order to plug and abandon the site before the accident and it was not until 1999 that the State finally declared the site a hazard to navigation.
As a result of the allision[1], Giorgio and Sanborn were seriously injured and the "Jo-Le" was taking on water and sinking. Giorgio sent a "mayday" signal over his VHS radio to which the "Massive Runner," a 152-foot crew boat responded. The injured men were rushed to Venice, from where they were transported by ambulance to Meadowcrest Hospital for treatment. The "Jo-Le" ultimately sank and was declared a total loss by the marine surveyor assigned by the insurer of the vessel.
Giorgio and Sanborn filed petitions for damages against several defendants that had at one time owned, operated or were otherwise responsible for the abandoned drilling structure into which the plaintiffs ran the "Jo-Le." All of the defendants except the State of Louisiana, Department of Natural Resources, were dismissed as a result of settlements before trial. Trial commenced on August 19, 2002. During trial, Gary Ross, a representative of the Louisiana Department of Conservation, testified that once the site was orphaned in 1995 and it was understood that neither Alliance nor Superior was exercising responsibility for the structure, it was the State's responsibility to determine whether it needed to be removed. After three days of testimony and receiving evidence, the trial court took the matter under advisement.
On January 28, 2003, the trial court rendered judgment in favor of the plaintiffs and against the State. The trial court awarded Sanborn: $100,000.00 for past physical pain, suffering and mental anguish; $125,000.00 for future physical pain, suffering, mental anguish and permanent disability; $10,414.72 for past medical expenses; $70,000.00 for future medical expenses; and $125,000.00 for property damage.[2] The trial court awarded Giorgio: $75,000.00 for past physical pain, suffering and mental anguish; $100,000.00 for future physical pain, suffering, mental anguish and permanent disability; and *1286 $3,851.50 for past medical expenses. In addition the plaintiffs were awarded legal interest from the date of judicial demand until paid for all past damages awarded, and interest from the date of judgment on all future damages awarded, plus all costs of the proceedings. The State now appeals the trial court's judgment.

DISCUSSION
On appeal, the State raises the following assignments of error: 1) it was legal error to not apply general maritime law to litigation arising out of the collision between a 38-foot yacht and a production barge in the navigable waters of Breton Sound, in which the essence of plaintiffs' claim was that the barge did not display navigation lights to alert mariners to its presence at night; 2) on the record before the district court, it was consequential error to not affix sole collision fault on the owner/operator of the modern radar-equipped yacht which struck an unlit production barge, whose precise location was depicted on the official nautical chart of the area; 3) it was legal error to cast the Department of Natural Resources in judgment for not lighting the barge when DNR had no ownership nor operating interest in the production barge, particularly where the evidence was undisputed that other parties had the legal duty under general maritime law to maintain its lighting and were, in fact, fulfilling that function; and 4) it was error to award damages of $125,000.00 to Jacques Sanborn for the total loss of the yacht when he was only a passenger thereon, and had no ownership interest whatsoever.
The State's first assignment of error involves the trial court's alleged failure to apply the general maritime law rather than Louisiana state law. Beginning with Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), the State, in its brief, cites a whole litany of cases for the proposition that the general maritime law should apply in the instant case. In Executive Jet, the United States Supreme Court states:
The law of admiralty has evolved over many centuries, designed and molded to handle problems of vessels relegated to ply the waterways of the world, beyond whose shores they cannot go. That law deals with navigational rules  rules that govern the manner and direction those vessels may rightly move upon the waters. When a collision occurs or a ship founders at sea, the law of admiralty looks to those rules to determine fault, liability, and all other questions that may arise from such a catastrophe. Through long experience, the law of the sea knows how to determine whether a particular ship is seaworthy, and it knows the nature of maintenance and cure. 409 U.S. at 269-70, 93 S.Ct. at 505.
However, it is also well settled that by virtue of the savings clause "a state, `having concurrent jurisdiction, is free to adopt such remedies, and to attach to them such incidents as it sees fit' so long as it does not attempt to make changes in the substantive maritime law." Offshore Logistics v. Tallentire, 477 U.S. 207, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986).[3] Furthermore, in Green v. Industrial Helicopters, Inc., 593 So.2d 634 (La.1992), the Louisiana Supreme Court found that the *1287 general maritime law authorized the application of state law as a supplement to the general maritime law unless there is some federal impediment to the application of that law in federal legislation or a clearly applicable rule in the general maritime law.[4] In the instant case, there was no election by the trial court to apply state law over the general maritime law. Therefore, the State has failed to show how any principals of state law cited in the trial court's reasons for judgment in any way conflict with the general maritime law. Accordingly, the State's first assignment of error is without merit.
In its second assignment of error, the State contends that the trial court erred in not affixing sole fault for the allision to Giorgio. Although Giorgio admitted that he was not aware that he was legally obligated to follow the inland rules of navigation set forth by the Inland Navigation Rules Act of 1980, 33 U.S.C. §§ 2001-2038, the defendant has failed to show how any violations of these rules was a proximate cause of the accident. The fact remains that the cluster of pilings adjacent to the abandoned unlit structure located in Breton Sound was the cause in fact of the accident. Accordingly, we find nothing manifestly erroneous with this factual finding of the trial court.
In its third assignment of error, the State contends that it was legal error to cast the DNR in judgment for not lighting the barge when DNR had no ownership, nor operating interest in the production barge and where there was evidence that other parties had the legal duty under general maritime law to maintain lighting and were fulfilling that function. In its reasons for judgment, the trial court stated: "By virtue of the release of the original lease by which these State water bottoms was [sic] encumbered, and the declaration of the site as orphaned by the State, the responsibility for the platform and the injuries suffered by the Plaintiffs is established."[5] In support of its position imposing liability upon the State, the trial court cites two recent cases from this Court, Anderson v. Tenneco Oil Co., XXXX-XXXX (La.App. 4 Cir. 5/24/02), 826 So.2d 1143, writ denied, 2002-2035 (La.App.11/1/02), 828 So.2d 585 and Melerine v. State, XXXX-XXXX (La.App. 4 Cir. 11/14/00), 773 So.2d 831.
In Melerine, a fisherman whose boat struck an abandoned oil well casing brought an action against the State and the well driller to recover damages for personal injuries and property damage. The trial court entered judgment for the fisherman and on appeal this Court held that that the abandoned oil well casing was under the sole ownership and custody of the State and the evidence supported a finding that the State was liable under negligence and strict liability theories. Id. at 840-843. In reaching this conclusion, the Court relied upon La. C.C. art. 493 for the proposition that the State, which owns the water bottoms on which the casings were located, became the owner of the abandoned oil well casings when they were not removed within 90 days after the lease was terminated. The Court relied upon *1288 La. C.C. art. 2317 for the proposition that the State is liable for the damage caused by the abandoned structure located on its property.
In Anderson, shrimpers sued the State for injuries they received when their boat struck an unmarked piling at night. The trial court entered judgment for the shrimpers. On appeal, this Court held among other things that the State owned and had garde over the wood pilings around the casing of an abandoned oil well and the State had actual and constructive notice of the wood pilings.[6]Id. at 1148-1154. In holding that the State owned and had garde over the pilings, this Court relied upon La. C.C. art. 493 as it did in Melerine. With regards to its holding that the State had actual and constructive knowledge of the wood pilings, this Court relied upon the fact that Tenneco had filed its plug and abandonment report with the State and the report clearly indicated that no well casing was pulled.
On April 28, 1994, Superior released all rights under State lease 8342; therefore, under La. C.C. art 493 and the rationale employed by this Court in both Melerine and Anderson, the State bears responsibility for the abandoned structure located on former State lease 8342. Furthermore, the State had actual knowledge of the dangerous condition of the structure in question. On December 16, 1997, a lawsuit involving the same structure on State lease 8342 was filed in the 25th Judicial District Court for the Parish of Plaquemines for an allision that occurred on December 16, 1996.[7]
The State contends that Shofstahl v. Board of Commissioners of the Orleans Levee District, XXXX-XXXX (La.App. 4 Cir. 1/15/03), 841 So.2d 1 exonerates it from liability in this case. Shofstahl, however, can be distinguished from the instant case. In Shofstahl, the plaintiffs ran their boat into an unlit pier near the shore of Lake Pontchartrain. This Court found that although the condition in which the defendants maintained the pier was a cause in fact of the accident, the plaintiffs were the sole proximate and superseding cause of their accident. In large part this Court's finding was based upon the fact that the owner and lessee of the pier had a permit stating pier lighting would be required if the United States Coast Guard prescribed lighting and there was no evidence that the Coast Guard did in fact prescribe lighting.
In the instant case, we are dealing not with a functioning pier, but a set of pilings adjacent to an abandoned oil production platform. The Department of Natural Resources, not the United States Coast Guard was the party responsible for determining whether or not the structure in question presented an unreasonable risk to public safety. The State of Louisiana, through its police power, has a significant interest in seeing to it that structures such as the one involved in the instant case are maintained in a safe condition. This interest was recognized by the legislature when it created the Louisiana Underwater Obstruction Removal Program. The purpose of this program was "to provide for the proper and timely identification, inventory, and removal of underwater obstructions which are a hazard to navigation and commercial fishing in the state." La. R.S. 30:101.2. Clearly, the instant case is more similar to Anderson and Melerine than it is to Shofstahl.
*1289 Based on the law and the record before this Court, we agree with the trial court that the State had custody of and responsibility for the accident site and the abandoned unlit structure presented an unreasonably dangerous hazard to navigation.
In its fourth assignment of error, the State challenges the trial court's award of property damage for the total loss of the "Jo-Le" to Sanborn when he had no ownership interest in the vessel. This assignment of error is without merit. The record clearly establishes that by virtue of a settlement of Sanborn's personal injury claim against 38BLLC (the boat's owner) and London Underwriters (the boat's insurer), and London Underwriters' settlement with Chevron, London Underwriters assigned its property damage rights against the State to Sanborn.

CONCLUSION
For the foregoing reasons, we affirm the trial court's findings of fact as well as the personal injury, medical expenses, and property damage awards made to Giorgio and Sanborn.
AFFIRMED.
TOBIAS, J., dissents and assigns reasons.
TOBIAS, J., dissenting.
I respectfully dissent.
I find that Shofstahl v. Board of Commissioners of the Orleans Levee District, XXXX-XXXX (La.App. 4 Cir. 1/15/03), 841 So.2d 1, writ denied XXXX-XXXX (La.9/26/03), 854 So.2d 368, (which the majority finds is factually distinguishable), is identical to the facts to the case at bar. Shofstahl and general maritime law bar recovery by the plaintiffs against the State of Louisiana, Department of Natural Resources.
In Shofstahl, the plaintiffs were proceeding at night in navigable waters when they hit an unlit pier that appeared on navigational charts. Recognizing that the claim fell within the admiralty laws and not state law, we stated:
Given that this boating accident occurred on navigable waters, the plaintiffs correctly first sought recovery under admiralty law. Thus, the governing law we use to determine whether summary judgment is appropriate will be that of general maritime law. Plaintiffs also correctly note that state law can be used to supplement the general maritime law, but this point will be discussed later.
The plaintiffs alleged negligence on the part of the defendants by the fact of the pier's existence on navigable waters. The defendants countered and responded by producing the permit for the pier granted by the U.S. Army Corps of Engineers in 1956.
Under general maritime tort law, this action shifted the burden of proof to the plaintiffs to show a duty or legal requirement on the defendants to affix a navigation light on the boat pier. To attempt to satisfy this burden, the plaintiffs alluded to a statement in the permit from the Army Corps which stated that lighting would be required if the U.S. Coast Guard prescribed it. After seven years of litigation, plaintiffs produced no evidence that the U.S. Coast Guard ever required a light on this pier.
We agree with the trial court, that without an incumbent duty on the part of the defendants to have lit the pier, the general maritime tort law does not hold the owners of a pier liable.
In American Commercial Barge v. Alter Barge Line, Inc., 2002 WL *1290 31246543 (E.D.La.10/4/2002), the court reflecting on maritime tort law stated:
When a moving vessel collides with a fixed object, there is a presumption that the moving vessel is at fault. The Oregon, 158 U.S. 186, 197, 15 S.Ct. 804, 39 L.Ed. 943 (1895).
* * *
The presumption may be overcome, however, if the moving vessel demonstrates that the collision, ... was caused by an act of God, the negligence of a third party, or the fault of the stationary object. See The Oregon, 158 U.S. 186, 197, 15 S.Ct. 804, 39 L.Ed. 943 (1895); Bunge Corp. v. M/V Furness Bridge, 558 F.2d 790, 794-95 (5th Cir.1977).
Upon reviewing the record, we find that plaintiffs did not come forth with evidence to prove a duty existed on behalf of the defendants to light the pier. Moreover, because the defendants had a permit, for which the U.S. Coast Guard did not require a light, and because the pier was marked on the official marine navigation chart published by the federal government, we find the plaintiffs did not prove that the pier constituted an unreasonable risk  to use the language of Louisiana tort law  even though maritime law applies.
The plaintiffs alleged that the trial court erred by not referencing more legal standards in this case. The trial court was succinct in its reasons for judgment, stating that it found no duty incumbent upon the defendants to light the pier. Even though the plaintiffs are correct in that more standards could have been applied, they are not in the plaintiffs' favor and would not change the outcome.
For example, the language of the federal navigational statute of 1980 (33 U.S.C. § 2006-2038) recognizes that mariners may encounter navigational hazards in conditions of poor visibility, and states:
Every vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions.
In determining a safe speed the following factors shall be among those taken into account:
(a) By all vessels:
(i) the state of visibility, ...
(v) the state of wind, sea, and current, and the proximity of navigational hazards; ...
See 33 U.S.C. § 2006.

Clearly a pier is an obstruction to navigation, but it is one that is routinely allowed, and this one was officially permitted by the federal government and noted on the appropriate navigational charts.
The legal duty under general maritime law to avoid an obstruction to navigation is on the operator and look-out (33 U.S.C. § 2005) of the vessel  the plaintiffs here. 33 U.S.C. § 2008.

Plaintiffs cite no statute or case law that the owner of a pier which is duly permitted by the federal government, and the precise location of which is depicted on the official marine navigation chart published by the federal government, has a legal duty to display a navigation light on the pier in circumstances where neither the federal permitting authority nor the federal regulatory/ enforcement authority requires the light....
All of these facts lead us to the next point, which is ultimately what was the cause of this maritime accident. The *1291 United States Supreme Court has held the requirement of legal or "proximate" causation and the related "superseding cause" doctrine apply in admiralty notwithstanding the adoption of the comparative fault principle in state law tort litigation. In Exxon v. Sofec, 517 U.S. 830, 116 S.Ct. 1813, 135 L.Ed.2d 113 (1996), Justice Thomas wrote for the Court:
The legal question that we took this case to address is whether a plaintiff in admiralty that is the superseding and thus the sole proximate cause of its own injury can recover part of its damages from tortfeasors or contracting partners whose blameworthy actions or breaches were causes in fact of the plaintiff's injury. As we have held above, the answer is that it may not.

517 U.S. at 840, 116 S.Ct. 1813.
In the present case, plaintiffs' actions are the superseding and the sole proximate cause of their injuries. While the defendants' unlit pier may be a cause in fact of the plaintiffs' injuries, cause in fact liability is not sufficient to justify a recovery using negligence principles of general maritime law. We recognize that this is different from most state tort law systems, where percentages of fault are allocated (whether they be proximate causes or causes in fact) and recovery is permitted according to the percentage of fault times the damages. Nevertheless, due to the situs and maritime nature of this accident, substantive general maritime law applies.
We embraced the "intervening" concept in Sutton v. Duplessis, 584 So.2d 362 (La.App. 4 Cir.1991) where we held:
Negligence is actionable only where it is both a cause in fact and a legal cause of the injury. Legal cause requires a proximate relation between the actions of a defendant and the harm which occurs, and such relation must be substantial in character. Sinitiere v. Lavergne, 391 So.2d 821 (La.1980) ...
A proximate cause is generally defined as any cause which, in natural and continuous sequence, unbroken by any efficient, intervening cause, produces the result complained of and without which the result would not have occurred. [Citations omitted.] When an accident results from two acts of negligence, one more remote and one an intervening cause, the presence of the intervening cause prevents a finding of liability on the one responsible for the more remote cause. [Citations omitted.]
In this case, we find that the negligence of the Orleans Parish School Board was an intervening cause which superseded any negligence on the part of Mrs. Sutton, and was the sole legal cause of Peter's injury.

Sutton, 584 So.2d at 365 [Emphasis added.]
Here, the plaintiffs' navigational negligence was the sole proximate cause of the allision and/or the superseding cause. A fixed object does not cause an accident simply by "being there." See American River Trans Company v. Arosita Shipping Company, 148 F.3d 446, 1998 AMC 2794 (5th Cir.1998).
The plaintiffs' third assignment of error is that the trial court did not apply a state legal standard of conduct by which to judge this alleged tort. The trial court was correct in applying substantive maritime tort law. This accident occurred over navigable waters in a boat. The act of boating is the most classical of all maritime activities. The fact that a boat strikes a boat pier does *1292 not involve state policy considerations so significant as to justify altering general maritime law. Adams v. Chevron, U.S.A., Inc., 589 So.2d 1219 (La.App. 4 Cir.1991). Moreover, federal general maritime law preempts state law, and state law should supplement general maritime law only under special circumstances. This is not one of those circumstances.
Plaintiffs cite Green v. Industrial Helicopters, Inc., 593 So.2d 634 (La.1992) to argue that state tort law should govern this case. The United States Supreme Court has explained, "Even though Congress has acted in the admiralty area, state regulation is permissible, absent a clear conflict with the federal law." Askew v. American Waterways Operators, Inc., 411 U.S. 325, 341, 93 S.Ct. 1590, 36 L.Ed.2d 280 (1973); see; Ray v. Atlantic Richfield Co., 435 U.S. 151, 157, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978). Thus, "the general rule on preemption in admiralty is that states may supplement federal admiralty law as applied to matters of local concern, so long as state law does not actually conflict with federal law or interfere with the uniform working of the maritime legal system." Pacific Merchant Shipping Ass'n v. Aubry, 918 F.2d 1409, 1422 (9th Cir.1990).
We distinguish Green, because that accident involved a helicopter crash over navigable waters, something that was not classical maritime activity. Under the facts here, there is no need to supplement federal law, there is a clearly applicable rule in the general maritime law. Green, supra at 638. An application of state law to these facts would interfere with the uniform working of the maritime legal system. Moreover, to make a finding that lights should have been required on the pier, would usurp power granted by the federal government to the U.S. Coast Guard.
Id. at pp. 6-11, 841 So.2d 4-7. [Footnote omitted; emphasis in original.]
The majority's reliance on Anderson v. Tenneco Oil Co., XXXX-XXXX (La.App. 4 Cir. 5/24/02), 826 So.2d 1143, and Melerine v. State, XXXX-XXXX (La.App. 4 Cir. 11/14/00), 773 So.2d 831, is misplaced. In both cases, the plaintiffs suffered damages after striking the remenant of oil drilling activities. Each remenant had been abandoned by the oil industry and the state became the owner of the remenant; the state had knowledge of the existence of the remenant. No evidence existed in either case that the remenant appeared on any nautical chart. The state was held responsible under a theory of garde and or ownership.
In the case at bar, unlike the situations in Anderson and Melerine, the National Oceanic and Atmospheric Administration charts of Breton Sound show the obstruction which the Jo-Le struck. Giorgio had charts aboard the Jo-Le, one of which depicted the obstruction. He failed to exercise the necessary care. In my view, Shofstahl controls the facts of this case, not Anderson or Melerine, by virtue of official charts in the possession of the vessel operator that noted the obstruction.
The majority places special emphasis upon the testimony of Gary Ross, a representative of the Louisiana Department of Conservation, who opined that once the site was orphaned and neither Alliance nor Superior exercised further control of the structure, "it was the State's responsibility to determine whether it [the structure] needed to be removed." By making the foregoing statement, the majority opens up the question of whether the state has abused its discretion in not removing the structure. This raises the issue of the "public duty doctrine" embodied in La. R.S. 9:2798.1, which states:

*1293 A. As used in this Section, "public entity" means and includes the state and any of its branches, departments, offices, agencies, boards, commissions, instrumentalities, officers, officials, employees, and political subdivisions and the departments, offices, agencies, boards, commissions, instrumentalities, officers, officials, and employees of such political subdivisions.
B. Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties.
C. The provisions of Subsection B of this Section are not applicable:
(1) To acts or omissions which are not reasonably related to the legitimate governmental objective for which the policymaking or discretionary power exists; or
(2) To acts or omissions which constitute criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct.
D. The legislature finds and states that the purpose of this Section is not to reestablish any immunity based on the status of sovereignty but rather to clarify the substantive content and parameters of application of such legislatively created codal articles and laws and also to assist in the implementation of Article II of the Constitution of Louisiana.
Certainly the state had the right to determine when and if the structure should be removed, but the plaintiffs have presented no evidence to establish a breach of a duty, especially in view of the fact that the structure was noted on official navigational charts. One cannot say that the state acted unreasonably in the case at bar. I find that La. R.S. 9:2798.1 provides further grounds to support a reversal of the trial court's decision.
Finally, I find that the majority's reliance upon La. R.S. 30:101.1, et seq., the Louisiana Underwater Obstruction Removal Program, to impose liability upon the state is misplaced. By the clear language of the statute, an "underwater obstruction" is "any obstacle, whether natural or manmade, which impedes normal navigation and commercial fishing on the navigable waters of the state." La. R.S. 30:101.3(6). By implication, the statute applies to obstructions that are not visible to the eye. The structure in the case at bar was not underwater and was visible to the eye. But even assuming that the statute applies to visible structures, one must examine La. R.S. 30:101.8, which specifically states that the secretary and assistant secretary [of the Department of Natural Resources] shall not be liable for any damages arising from an act or omission if the act or omission is part of a good faith effort to carry out the purposes of ..." La. R.S. 101.1, et seq. Cf., La. R.S. 9:2798.1. The record before us fails to disclose any evidence that the state did anything that was not a good faith effort to comply with the law, given the limitation of finances of the state, the funds available to the program, and the designation of the structure on official navigation charts.
I conclude, therefore, that general maritime law applied to this accident. Further, the precise location of the obstruction appeared on official nautical charts which Giorgio failed to observe and exercise appropriate caution. See 33 U.S.C. §§ 2001, et seq. No duty existed for the state to light the obstruction. The state is not liable under La. R.S. 9:2798.1 or La. R.S. 30:101.8 because as a matter of common
*1294 sense and law the appearance of the obstruction on an official nautical chart was sufficient to warn those traveling upon navigable water of the obstruction. For these reasons, inter alia, we are required by law to reverse and not affirm as the majority so holds.
NOTES
[1] The trial court refers to the accident as a collision but more properly it should be labeled an allision. An allision is the running of one vessel into or against another vessel or object, as distinguished from a collision, i.e., the running of two vessels against each other. But this distinction is not very carefully observed.
[2] Sanborn was awarded property damage for the total loss of the "Jo-Le." Although the vessel had been owned by an L.L.C. in which Giorgio was a member, the claim for the loss of the "Jo-Le" was assigned to Sanborn in a pre-trial settlement agreement reached between the parties.
[3] State courts have concurrent jurisdiction by virtue of the "savings to suitors" clause of the Judiciary Act of 1789. In 1948 this provision was amended to read: The district courts shall have original jurisdiction, exclusive of the courts of the states, of any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled. 28 U.S.C.A. § 1333.
[4] "[T]he precise extent to which local rules of law will operate to modify the general maritime law applied in the federal admiralty court is by no means clear. Indeed, it would have to be said that there are not even any clearly visible principles governing the nature and degree of permissible modifications of this sort.... [I]t is not clear that state courts are limited with respect to the application of local law to the same degree  whatever it may be  as are the federal admiralty courts." D. Robertson, Admiralty and Federalism, p. 146 (1970).
[5] This is supported by the Louisiana Oilfield Restoration Law, LSA-R.S. 30:80 et seq.
[6] This Court also held that the State was not immune from liability under the Recreational Use Immunity Statutes (La. R.S. 9:2791 and La. R.S. 9:2795).
[7] All American Crew Boats, Inc. v. State of Louisiana through the Department of Natural Resources, et al., District Court No. 42-849